# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

GEORGE MARK TUGGLE,      :
     :
        Plaintiff,      :     CIVIL ACTION
     :
v.      :     FILE NO. 1:06CV-00272-ODE
     :
CLAYTON COUNTY SHERIFF      :
VICTOR HILL, in both his      :
Official and Individual      :
Capacities, and      :
DEPUTY SHERIFF JOANNE      :
BORRELLI,      :
     :
        Defendants.      :

## DEFENDANTS CLAYTON COUNTY SHERIFF VICTOR HILL AND DEPUTY SHERIFF JOANNE BORRELLI'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants in the above-styled action, Clayton County

Sheriff Victor Hill and Deputy Sheriff Joanne Borrelli, and file with this

Court their Brief in Support of their Motion for Summary Judgment and

state the following:

## I.  STATEMENT OF THE CASE

On February 2, 2006, Plaintiff, George Mark Tuggle (hereinafter

"Plaintiff"), filed his lawsuit against Clayton County Sheriff Victor Hill in

both his official and individual capacities (hereinafter "Sheriff Hill") and

Deputy Sheriff Joanne Borrelli (hereinafter "Deputy Borrelli")(or collectively as "Defendants") alleging that Sheriff Hill and Deputy Sheriff Borrelli violated 42 U.S.C. §§ 1983 and 1988 and the First and Fourth Amendments of the Constitution of the United States and Constitution and the laws of the State of Georgia for false arrest, malicious prosecution and retaliatory prosecution by taking an application for an arrest warrant for harassing phone calls made by Plaintiff to Sheriff Hill and ultimately arresting Plaintiff.   Plaintiff asserts that the actions of the Defendants were willful, deliberate and malicious and that the Defendants are liable for punitive damages in an amount to be determined at trial (Complaint, ¶ 65).

On March 20, 2006, and April 13, 2006, Sheriff Hill and Deputy Sheriff Borrelli filed their Answers to the Complaint denying Plaintiff's allegations and asserting, among other things, the defenses of official and qualified immunity.  Furthermore, Deputy Sheriff Borrelli asserted that she acted according to proper procedure in preparing the Incident Report and the Application for a Warrant which was then presented to the Chief Magistrate Judge of Clayton County (Borrelli Answer ¶ 26).  Further, the Answers argued that there was insufficient evidence to support a finding of any false arrest, malicious prosecution, retaliatory prosecution or constitutional

violation by Sheriff Hill or Deputy Sheriff Borrelli. Thereafter, the parties engaged in discovery. After three (3) extensions, discovery closed on December 19, 2006. The parties did agree, however, to extend discovery for the sole purpose of medical depositions in the event Defendant's Motion for Summary Judgment is denied.

## II. THE PARTIES

A. **George Mark Tuggle**

Plaintiff is now a resident of Knoxville, Tennessee, who had, for about a year and a half lived in Jefferson, Georgia (Plaintiff's Response to Interrogatory Number 2 to Defendant Clayton County Sheriff Victor Hill's First Interrogatories to Plaintiff George Mark Tuggle, attached hereto as Exhibit "A"). Plaintiff is a former long-term resident of Clayton County, Georgia. Although Plaintiff is a high school graduate, he states that his reading comprehension is on a first (1st) grade level and that he struggles with reading. (Tuggle Depo. pp. 8-9).

Plaintiff is employed at Buddy Gregg Motorhomes in Knoxville, Tennessee as a general sales manager. (Tuggle Depo. p. 14). Plaintiff's current salary is $120,000.00 per year plus commissions. Previous employers include John Bleakley Motorhomes and Lightnin RV as a sales

manager.  (Exhibit "A", Response Number 8).  Plaintiff worked at Lightnin RV at the time of his arrest on January 4, 2005.  (Tuggle Depo. p. 78). Plaintiff's salary at the time of his arrest was $100,000.00 per year plus commissions. (Exhibit "A", Response Number 8).  Plaintiff also worked for Sagon Motor Homes as a service manager in Jonesboro, Georgia, from 1989 to 1991.  Plaintiff's salary at that position was $32,000.00 per year.  (Exhibit "A", Response Number 8).

Plaintiff was terminated from Sagon Motor Homes.  Plaintiff believes that he was terminated from Sagon for talking to the local district attorney about the family of his employer as it related to a drunken driving incident. (Tuggle Depo. p. 16).  After the termination, Plaintiff worked for John Bleakley in Douglasville, Georgia, as a sales manager for approximately eight (8) years.  (Exhibit "A", Response Number 8).

Plaintiff has a criminal history in Clayton County.  Plaintiff was arrested and taken to jail in an earlier incident in Clayton County.  On April 27, 1996, Plaintiff was arrested at a youth baseball game for fighting. (Tuggle Depo. p. 79).  Plaintiff was arrested and charged with affray.  The state court case number for this offense was 1996CR05969 and the Magistrate Court case number was 1996CW07075. (Attached hereto as

Exhibit "B", Clayton County Sheriff's Office, Sheriff's Administrative Operation Division, Records Section, Criminal History Record dated January 7, 2005). A warrant was issued in this case, number 9607075, and Plaintiff was taken to the Clayton County Jail for this incident, jail docket number 199609031. (Exhibit "B").

Plaintiff's brother, Stanley Tuggle, was Sheriff of Clayton County from 1997 until 2004, when Victor Hill defeated Stanley Tuggle in the race for the office of Sheriff of Clayton County. Plaintiff worked for his brother in his re-election campaign for sheriff. Plaintiff states that he contributed money, helped produce media information despite his admitted reading and comprehension problem, and built and placed campaign signs around Clayton County. Plaintiff could not read or write public information but "reviewed" what others had written. (Tuggle Depo. p. 18).

**B.    Sheriff Victor Hill**

Sheriff Victor Hill began his law enforcement career in Charleston, South Carolina in 1985 (Hill Depo. p. 8). Sheriff Hill joined the Charleston City Police Department as a police cadet immediately after high school and upon turning 21, went through the police academy in South Carolina to become a certified law enforcement officer. (Hill Depo. p. 8). After leaving the

Charleston police force in 1988, he worked as a police officer for the North Charleston City Police Department (Hill Depo. p. 9). Sheriff Hill then moved to the Atlanta area for more opportunity and challenge in his career. (Hill Depo. p. 16).

Sheriff Hill's first job in the Atlanta area was at South DeKalb Mall as a security guard. Sheriff Hill then worked his way up to second in command of security at South DeKalb Mall. (Hill Depo. p. 16).

Sheriff Hill was hired by the Clayton County Police Department as a patrolman in 1992. He worked in that position until his promotion to homicide detective in 1994. (Hill Depo. p. 18). Sheriff Hill was employed by the Clayton County Police Department for a total of twelve (12) years until his election to the position of Sheriff of Clayton County. Sheriff Hill also served in the Georgia Legislature as a state representative from 2003 to 2004 (Hill Depo. p. 55).

Sheriff Hill ran against the incumbent sheriff, Stanley Tuggle, in 2004. (Hill Depo. p. 57). Sheriff Hill was elected to the position of Sheriff of Clayton County in the primary election of July 2004. (Hill Depo. p. 56). Sheriff Hill took office as Sheriff of Clayton County on January 1, 2005. (Hill Depo. p. 80).

### C.     __Deputy Sheriff Joanne Borrelli__

Deputy Sheriff Joanne Borrelli[1] is originally from Maine and has been an employee with the Clayton County Sheriff's Department since April of 1996. (Borrelli Depo. p. 7). She received her Nursing Assistant certification from MidCo School of Technology in Maine in 1991 and her Emergency Medical Technician certification from Southern Maine Technical College in 1993. (Borrelli Depo. p. 8). She moved to the Atlanta, Georgia, area in 1993 or 1994. (Borrelli Depo. p. 7). Borrelli graduated from the Clayton County police academy in December 1995 and was hired by the Clayton County Sheriff's Department in Clayton County in April of 1996 as a deputy sheriff. (Borrelli Depo. p. 11). She was assigned to the Jail from 1996 until 2000 when she was assigned to Field Operations (Borrelli Depo. p. 14). In February 2005, Borrelli was promoted to investigator in the Internal Affairs division of the Sheriff's Department. (Borrelli Depo. p. 32). Borrelli is currently attached to the Federal Bureau of Investigation. (Borrelli Depo. p. 32). Borrelli is married to Shawn Southerland, a lieutenant also working for the Clayton County Sheriff's Department. (Borrelli Depo. p. 45).

---

[1] Joanne Borrelli is now married and is known as Joanne Borrelli Southerland. For purposes of this Brief and for clarity, Borrelli's married name will not be used to identify her.

# III.  **STATEMENT OF FACTS**

The facts of this case are relatively straightforward as they relate to the acts of Plaintiff and the Clayton County Sheriff's Department, (i.e. the harassing phone calls, the application and issuance of a warrant, Plaintiff's arrest, booking and medical treatment at the Clayton County Jail in Jonesboro, Clayton County, Georgia on January 4, 2005).  The facts will also show that the manner in which Plaintiff's arrest was handled was routine and nothing out of the ordinary took place.

Sheriff Hill took office on January 1, 2005, replacing Stanley Tuggle.  (Hill Depo. p. 80).  Sheriff Hill was not allowed any transition time from the prior administration of Sheriff Tuggle to the start-up of his own administration.  (Hill Depo. p. 105).  Therefore, the first day in the office for Sheriff Hill's employees was Monday, January 3, 2005.  (Hill Depo. p.86; Antoine Depo. p. 18; Hanner Depo. p. 9).  The first days in office for Sheriff Hill and his staff was a time to set up the new administration.  It was a very hectic time.  There were a lot of new people and a lot of activity in and around the Sheriff's Office.  (Hill Depo. p. 107; Borrelli Depo. p. 74)  The new, and even the current, employees were uncertain as to their eventual assignments.  There were many people coming in and out of the Sheriff's

office.  (Hanner Depo. p. 45;  Ruth Depo. p. 8; Borrelli Depo. p. 74).  Also, there were many phone calls coming into the Sheriff's Office.  The Sheriff may have received at least a hundred messages from the media, friends and from all types of people.  (Hill Depo. p. 125).

On Monday, January 3, 2005, Sheriff Hill's first day in the office, a number of deputies were terminated from employment with the Clayton County Sheriff's Office.  (Hill Depo. p. 91; Hanner Depo. p. 11;  Antoine Depo. p. 21).   The news media became aware of this story and started calling the Sheriff's Office early that same day. (Hill Depo. p. 94).  Reporters and news media trucks were on site within hours (Hill Depo. p. 94).

When Sheriff Hill took office, he was mindful of another Atlanta metropolitan area sheriff who had been murdered shortly before he took office -- Sheriff Derwin Brown of DeKalb County. (Hill Depo. p. 101).   The situations were similar in that Sheriff Derwin Brown had promised and campaigned for change within the DeKalb County Sheriff's Office.  (Hill Depo. p. 101).

On Monday evening, January 3, 2005, at approximately 6:20pm, Captain Jon Antoine, who had been selected as the Sheriff's head of internal

affairs, answered the Sheriff's Office phone line. (Antoine Depo. p. 28). The caller asked to speak to Sheriff Hill. Antoine advised the caller that the Sheriff was in a meeting and asked whether the caller wanted to leave a message. (Antoine Depo. p. 28). The caller identified himself as Mark Tuggle, the Plaintiff herein. Plaintiff left a telephone number for a return call and then told Antoine that firing those people was low. (Clayton County Sheriff's Office Statement Form dated January 4, 2005 of Jon Antoine, attached hereto as Exhibit "C"). Plaintiff referred to Sheriff Hill as "scum".[2] (Tuggle Depo. p. 33). Plaintiff further stated, when advised that the Sheriff was in a meeting, that "it can't be much of a meeting" if Sheriff Hill was conducting it. (Tuggle Depo. p. 47).

Plaintiff called the Sheriff's Office back less than 15 minutes after the first call and got the Sheriff Office's automated answering service. (Tuggle Depo. p. 39). In this voice message, Plaintiff left his name and number and said that he wanted a meeting with that "short little bastard Sheriff of ya'lls". (Tuggle Depo. p. 37). Plaintiff admitted that there was almost no time

---

[2] Although there is some variation of how and when Plaintiff referred to Sheriff Hill as "scum" or whether Plaintiff also stated that any person working for the Sheriff was "low" or that the actions of Sheriff Hill in terminating certain employees was "low", the variation is not relevant. Plaintiff admits that: (1) he telephoned Sheriff Hill; (2) he intended to call (and in Plaintiff's mind did call) Sheriff Hill "scum" and a "short little bastard Sheriff"; and (3) he said that Sheriff Hill's actions were low and referred to him as a "short little bastard Sheriff". (Tuggle Depo. p. 37).

between the first and second phone calls to the Sheriff.  (Tuggle Depo. p. 39).

The next morning, Tuesday, January 4, 2005, Patricia Ruth, Sheriff Hill's new secretary, was retrieving voicemail messages at her desk located in the Sheriff's reception area.   (Ruth Depo. p. 15).  The first message on the voicemail was that of Plaintiff, who identified himself, and said that he wanted a meeting with the "short little bastard Sheriff of ya'lls."   (Ruth Depo. p. 14; Tuggle Depo. p. 31; Borrelli Depo. p. 84).  Ms. Ruth did not listen to the entire message.  As soon as she heard the profanity, Ms. Ruth immediately handed the phone to Jon Antoine to listen to the message. (Ruth Depo. p. 19-20).  Ms. Ruth did not want to subject herself to the profanity on the voicemail message and passed the call to a superior. (Ruth Depo. p. 33).

On that day, Phillip Hanner was a newly hired lieutenant with Internal Affairs at the Clayton County Sheriff's Office. (Hanner Depo. p. 8).  Hanner was one of the employees in the Sheriff's Office that morning.  (Hanner Depo. p.  14).  Hanner and Antoine, and possibly several others, heard the voice mail message replayed that morning and were concerned due to the Plaintiff's tone and the frequency of the calls.  (Hanner Depo. p. 18; Ruth

Depo. p. 20). The caller's voice sounded shaky, angry and extremely upset. (Hanner Depo. p. 18). The tone of the voice message indicated a "meanness in the tone". (Antoine Depo. p. 30). Patricia Ruth perceived the message as a threat to the Sheriff (Ruth Depo. p. 35).

Sheriff Hill was advised of the voicemail message. (Antoine Depo. p. 35). The Sheriff said "I want him locked up." (Borrelli Depo. p. 95; Hanner Depo. p. 27). Sheriff Hill told Antoine to handle the incident with Plaintiff like any other matter. (Hill Depo. p. 152). According to Sheriff Hill, he received many phone messages that day and did not have time to focus on phone messages from one individual. (Hill Depo. p. 156).

Hanner was directed by someone, it is not clear whom, to get the recording equipment to record a copy of the message. (Hanner Depo. p. 21). An audiotape copy of the message was made. (Hanner Depo. p. 21). Plaintiff's voice message was then played for Deputy Sheriff Joanne Borrelli. (Hanner Depo. p. 22).

Borrelli was a deputy sheriff with the Sheriff's Office and was assigned to the Sheriff's suite on January 4, 2005, as a security officer. (Borrelli Depo. p. 70) Borrelli was asked to write the incident report and to fill out the application for the warrant by one of her supervisors, Hanner.

(Borrelli Depo. p. 77).  Hanner told Borrelli that the Sheriff said he wanted

Plaintiff locked up for harassing phone calls.  (Borrelli Depo p. 78).

According to Hanner, he understood the Sheriff's instructions to mean that

the appropriate procedures and policies were to be followed in investigating

this incident with Plaintiff.  Based upon his nine (9) years of experience at

the time, Hanner did not interpret Hill's instructions to mean that special

measures regarding Plaintiff were to be taken.  (Hanner Depo. p. 39).

Borrelli gathered all the facts, including the statement of Antoine,

reviewed the statute and followed the procedure that she would have

followed any other time and with any other person and presented it to a third

party for review. (Borrelli Depo. p. 119).  Lt. Shawn Southerland had started

typing the report but because Borrelli had been employed with the prior

Sheriff's administration, she knew how to get into the computer system and

type the report.  (Borrelli Depo. p. 87).  The other new employees, such as

Antoine and Hanner, did not have a password for the computer.  (Antoine

Depo. p. 20).  Borrelli typed the report based on the audiotape of the second

phone call and Antoine's report of the first call.  (Borrelli Depo. p. 94).

Borrelli completed the Application for Criminal Arrest Warrant.  (Exhibit

"D").  Borrelli then went with Hanner to the Chief Magistrate Judge's office.

(Borrelli Depo. p. 128; Hanner Depo. p. 23). Borrelli took a copy of the audiotape, along with the Application for the warrant. Borrelli presented the facts of the case to the Chief Magistrate Judge ("Judge"). (Borrelli Depo. p. 96). The Judge played and listened to the audiotape. (Borrelli Depo. p. 128). Hanner was not present in the Judge's private office during this time. Hanner waited in the Judge's reception area. (Hanner Depo. p. 23). After reviewing the Application and considering the evidence, the Judge issued two warrants for harassing phone calls. (Exhibits "E" and "F"; Borrelli Depo. p. 96). Borrelli and Hanner then walked back to the Sheriff's Office with the warrants for service by the Sheriff's Office. Borelli and Hanner then placed the audiotape into the evidence locker (Hanner Depo. p.24).[3]

A deputy sheriff assigned to the Warrants Division, Eddie Hall, called Plaintiff's house to advise the Plaintiff that there was a warrant for his arrest. (Borrelli Depo. p. 47). Plaintiff's wife called Plaintiff at work to advise him of same. (Tuggle Depo. p. 52). Plaintiff called the Sheriff's office to advise that he would turn himself in later that day. (Tuggle Depo. p. 54; Borrelli Depo. pp. 47-48). Chief William Cassells, the second in command to

---

[3] The audiotape was later delivered to the Clayton County Solicitor as evidence. The audiotape was misplaced after the Solicitor decided not to prosecute the Plaintiff's case. The audiotape was recently discovered in a locker belonging to Chief William Cassells, formerly with the Sheriff's Office.

Sheriff Hill, was told of Plaintiff's decision to turn himself in at a later time and found the offer unacceptable. Cassells said that Plaintiff would turn himself in within the hour or deputies would be sent to his work to pick him up. (Tuggle Depo. p. 54). Plaintiff turned himself in. Borrelli, Southerland and Cassells went down to the visitor's entrance of the Sheriff's entrance at the Clayton County Courthouse to meet Plaintiff (Borrelli Depo. p. 134). Plaintiff was asked to put his hands behind his back and handcuffed. (Borrelli Depo. p. 134).

Southerland went back to the Sheriff's suite, so Borrelli and Cassells walked Plaintiff down to intake at the Jail. (Borrelli Depo. p. 135). Borrelli turned Plaintiff over to the corrections officer at intake and left. (Borrelli Depo. p. 136). Other than Plaintiff's own word, there is no evidence that Plaintiff was treated roughly by any Sheriff's deputies or that he was thrown against a wall to be handcuffed.

Medical services at the Clayton County Jail are handled on a contract basis by Georgia Correctional Health, LLC, a medical care provider. The medical staff at the Jail are employees of Georgia Correctional Health, LLC.

At booking, Plaintiff's blood pressure was taken by a medical assistant at medical screening. His blood pressure was very high. (Blood

Pressure Record, Exhibit "G"). Tina McGee, a licensed practical nurse ("LPN") at intake, called the nurse in charge who came over and took care of Plaintiff because his blood pressure was so high. (Sworn Statement of Tina May McGee, dated December 18, 2006, p. 7, attached hereto as Exhibit "H"). The nurse in charge was Pauline Thomas, a registered nurse ("RN"). Ms. Thomas was advised that there was an inmate with very high blood pressure. (Sworn Statement of Pauline Thomas, dated December 18, 2006, p. 7, attached hereto as Exhibit "I"). Nurse McGee reported that Plaintiff's blood pressure was very high, dangerously high, at 230 over 120. (Exhibit "H"). Plaintiff was given the appropriate medication for his high blood pressure, was rechecked an hour later, and then booked in by having his fingerprints and photograph taken. (Exhibit "H"). Daina Matheny was the licensed practical nurse ("LPN") in the infirmary at the jail and was one of the nurses caring for Plaintiff. Matheny checked Plaintiff's blood pressure and admitted him into the infirmary. (Sworn Statement of Daina Matheny dated December 18, 2006, pp. 6-7, attached hereto as Exhibit "J").

Linda Faulkner is a family nurse practitioner and was working at the Clayton County Jail during Plaintiff's incarceration. Faulkner says she saw Plaintiff on January 5, 2005. According to her notes, Plaintiff's blood

pressure was very high, that the medical staff treated him and that she examined him. (Progress Notes of Georgia Correctional Health, LLC, dated January 4 and 5, 2005, attached hereto as Exhibit "K"). Faulkner stated further that Plaintiff told her that he had been told in the past that he had hypertension but he had never taken any medicine to treat it. (Sworn Statement of Linda Faulkner dated December 18, 2006, p. 11, attached hereto as Exhibit "L"). Faulkner says that Plaintiff was noticeably overweight, by more than thirty (30) pounds. (Exhibit "L", Faulkner Sworn Statement, pp. 12-13). Plaintiff denied having any chest pain, shortness of breath or headache. (Exhibit "L", Faulkner Sworn Statement, p. 12).

None of the medical professionals noted on any records at the infirmary that Plaintiff was being abused, harassed or shouted at by any sheriff's deputies. (Exhibit "L", Faulkner Sworn Statement, pp. 14-15; Exhibit "I", Thomas Sworn Statement, pp. 11-13; Exhibit "J", Matheny Sworn Statement, pp. 7-8). There was nothing unusual in the manner in which sheriff's deputies were interacting with Plaintiff. (Exhibit "H", McGee Sworn Statement, p. 10-11). There was no shouting at or intimidation of Plaintiff. (Exhibit "J", Matheny Sworn Statement, p. 7-8). Furthermore, if there had been shouting or abusive behavior directed toward

Plaintiff, the nurses would have written down their observations in their notes. (Exhibit "I", Thomas Sworn Statement, p. 12; Exhibit "J", Matheny Sworn Statement, p. 10).

It appears that Plaintiff was cooperative and, therefore, there appeared to be no need for deputies to hover around him. (Exhibit "L", Faulkner Sworn Statement, p. 15; Exhibit "H", McGee Sworn Statement, p.12; Exhibit "I", Thomas Sworn Statement, p. 8).

Contrary to the allegation blatantly set out in paragraph 34 of Plaintiff's Complaint, there is no evidence that any nurse "took charge" or had to "intervene" with deputies for Tuggle to get the proper care. (Exhibit "I", Thomas Sworn Statement, p. 12; Exhibit "J", Matheny Sworn Statement, pp. 10-11; Exhibit "H", McGee Sworn Statement, p. 11). Plaintiff's allegation is not only false, but is intended to mislead.

Plaintiff was booked in and dressed in a bold orange jumpsuit. Contrary to Plaintiff's assertion in paragraph 35 of the Complaint, orange is the color for the general population in the Jail and red is the color for violent offenders. (Borrelli Depo. p. 138). Plaintiff bonded out 29 hours later without incident.

Plaintiff's case was forwarded to the Solicitor's Office and dismissed prior to the filing of an accusation. (State Court of Clayton County, Order of Dismissal in Case No. 2005AD06082/2005SG06182, dated August 5, 2005, attached hereto as Exhibit "M".)

In summary, the phone calls were addressed by the Sheriff's Office as they would have been for any other person in the same situation. The application for a warrant was written by a sheriff's deputy according to proper law enforcement procedure. The Chief Magistrate Judge, an independent third party, reviewed Joanne Borrelli's Application for Warrant and made the decision that the evidence and information presented met the requirements of the statute for harassing phone calls and then issued two (2) warrants, one for each phone call.[4]

Plaintiff received a courtesy call from a deputy sheriff to turn himself in. Plaintiff did turn himself in and was treated properly by all law enforcement and medical personnel at the Jail. There is no evidence that Plaintiff was treated improperly during his entire incarceration period. There is no evidence that Plaintiff suffered from any medical condition that

---

[4] Defendants admit that the Chief Magistrate Judge's decision to issue two (2) warrants may have been in error. It would appear that only one (1) warrant could have been issued for the two (2) phone calls. Defendants, however, cannot speak to what the Chief Magistrate Judge was thinking when she read the statute and considered the evidence.

was brought on by an arrest, illegal or otherwise.  There is no evidence that the arrest has caused irreparable harm to Plaintiff's reputation to the community or has jeopardized his employment and negatively affected his business relations.

## IV.  ARGUMENT AND CITATION OF AUTHORITY

### A.  Summary Judgment Standard.

Based upon the facts set forth above, Victor Hill, individually and in his official capacity as an independent, constitutional, elected official, and Joanne Borrelli are entitled to a grant of summary judgment.  Federal Rule of Civil Procedure 56(c) states in relevant part that:

> *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.*

Celotex Corp. v. Catrett, 477 U.S.C. § 317, 1986; and Lordmann Enterprises, Inc. v. Equicor, 32 F.3d 1529, 1532 (11th Cir. 1994), cert. denied, 516 U.S. 930 (1995).

The Federal Rules mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). The movant is not required to negate the opponent's claim, but may discharge his burden by merely "showing--that is--pointing out to the District Court--that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. See also United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991).

The party moving for summary judgment bears the initial burden of showing there are no genuine issues of material fact that should be decided at trial and that he is entitled to judgment as a matter of law. When that has been done, the burden shifts to the non-moving party to demonstrate that there is indeed a material issue of fact or law precluding summary judgment. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party is required "to go beyond the pleadings" and **present competent evidence** designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324-325 (emphasis added).

The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material fact*." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986) (emphasis in the original); Brown v. City of Clewiston, 848 F.2d 1534, 1537 (11th Cir. 1988).  An issue is only genuine if it is supported by the evidence or is created by evidence that is more than "merely colorable" or "not significantly probative."  Anderson, 477 U.S. at 249-250.

Clearly, the evidence relating to Plaintiff's allegations and Defendants' subsequent actions (i.e. the depositions, statements and exhibits) show that Plaintiff has no evidence to support his claim and that the Defendants' conduct was appropriate.  Defendants are entitled to summary judgment.  Moreover, Plaintiff's admission that he made repeated calls to the Sheriff's Office demonstrates that Defendants acted properly under the circumstances.[5]  Joanne Borrelli, based on the facts, had probable cause to complete an application for a warrant and the appropriateness of her actions cloak both Sheriff Hill and herself from liability.  As set forth in Anderson, Plaintiff's questioning of how he would have preferred to be treated after

---

[5] As set forth above, Sheriff Hill's only involvement was that he instructed his staff to follow proper procedure and have Plaintiff arrested if it was determined by the Chief Magistrate Judge that a crime was committed.  (See Hanner Depo. p. 39).

making the calls to the Sheriff's Office does not defeat this Motion because Plaintiff's position is, at best, a factual dispute and is not significantly probative evidence.

**B.      Plaintiff Fails to State A Claim Under Section 1983, And, Therefore, Summary Judgment In His Favor Is Proper.**

Even if Plaintiff could survive the proof hurdles of a Section 1983 claim, no legal basis for his claims exists. Defendants are not liable to Plaintiff for any alleged constitutional violations.

**1.      No Basis for any Fourteenth Amendment Liability.**

Plaintiff's Complaint asserts that he was arrested without probable cause and detained against his will in violation of the Fourteenth Amendment of the United States Constitution. (Complaint, ¶ 50-52). Notwithstanding the Plaintiff's allegations, Defendants are not liable to Plaintiff for this, or any other, cause of action.

In Section 1983 actions, only alleged conduct that "shocks the conscience" of federal judges will state a claim for violation of an individual's substantive due process rights. McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994), citing Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209 (1952). The Eleventh Circuit rarely finds any substantive component of the due process clause to have been violated. McKinney, 20

F.3d at 1556. Although Plaintiff has made assertions that Defendants engaged in wrongful conduct, he has not asserted, nor is there any evidence in the record, that Defendants engaged in any conduct that would "shock the conscience". Applying for a warrant, presenting evidence to a magistrate, receiving a warrant from the magistrate and effectuating an arrest, is proper. Although a stressful situation for Plaintiff, his reaction was no different than most people being arrested. (McGee Sworn Statement, p. 12). Accordingly, and for the above-stated reasons, Defendants are not liable to Plaintiff on this or any other Fourteenth Amendment cause of action.

### 2. No Basis for any Fourth Amendment Liability.

Allegations of false arrest and malicious prosecution are properly analyzed under the Fourth Amendment's reasonableness standard. There is no doubt that Sheriff Hill and Deputy Borrelli took part in the events which resulted in Plaintiff's arrest in this case and that an arrest is a seizure for Fourth Amendment purposes. The Fourth Amendment, however, does not protect against *all* seizures, but only protects against *unreasonable* seizures. Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003).

The Eleventh Circuit has repeatedly held that "[a]n arrest does not violate the Fourth Amendment if a police officer has probable cause for the

arrest." <u>Draper v. Reynolds</u>, 36a F.3d 1270 (11th Cir. 2004); <u>Wood v. Kesler</u>, 323 F.3d 872, 878 (11th Cir. 2003), citing <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194-1195 (11th Cir. 2002); <u>Ortega v. Christian</u>, 85 F.3d 1521, 1525 (11th Cir. 1996); <u>Von Stein v. Brescher</u>, 904 F.2d 572, 578 (11th Cir. 1990). Further, "[f]or probable cause to exist,… an arrest must be objectively reasonable based on the totality of the circumstances." <u>Wood</u> at 878, citing <u>Lee</u> at 1195.

In <u>Draper</u>, the trial court granted a police officer's motion for summary judgment against plaintiff's allegation for the officer's violation of plaintiff's Fourth Amendment rights based on the plaintiff's behavior and the reasonableness of the officer's conduct. The facts in <u>Draper</u> show that defendant police officer stopped plaintiff because of a tag-light violation. When plaintiff refused to provide certain information, follow the officer's instructions and became loud, belligerent and physically aggressive, the officer discharged his taser gun and arrested plaintiff. On appeal, the court concluded that the police officer had probable cause to: (1) stop plaintiff for the tag-light violation; and (2) arrest plaintiff for the violation. Furthermore, the court concluded that plaintiff's conduct necessitated the use of the taser gun and, under the circumstances, did not constitute excessive force.

Accordingly, courts will cloak a police officer from liability in appropriate situations. Therefore, "[t]his standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." Wood at 878, citing Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998).

Inasmuch as probable cause requires more than mere suspicion, it is clear that "it does not require convincing proof." Lee v. Ferraro, 284 F.3d 1188, 1195, citing Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998). See also, Bailey v. Bd of County Commissioners of Alachua County, 956 F.2d 1112, 1119 (11th Cir. 1992). Moreover, "'[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003) quoting Adams v. Williams, 407 U.S. 143, 149 (1972).

In this case, Plaintiff admits to making back-to-back phone calls using derogatory and profane language. (Tuggle Depo. pp. 38-39). The tone of Plaintiff's message, when considered by those officers present, together with

the circumstances on January 4, 2005, was a cause for concern. (Hanner Depo. p. 18). In light of the situation, Deputy Borrelli gathered all information available relating to Plaintiff's calls to the Sheriff's Office. She then completed the appropriate paperwork and presented it, along with the audiotape, to the Chief Magistrate. Sheriff Hill's involvement was that he ordered his staff to follow proper procedure if it was decided that Plaintiff had broken the law. (Hanner Depo., p. 27). Borrelli heard the audiotape and concluded that presenting all facts to the Chief Magistrate was appropriate. Keep in mind, also, that according to Phillip Hanner, Plaintiff's voice "sounded shaky, angry and extremely upset". (Hanner Depo. p. 18).

Deputy Borrelli's investigation of Plaintiff's behavior would lead any reasonable officer to suspect that Plaintiff had committed a crime, and as such, Deputy Borrelli correctly concluded that there was probable cause to apply for a warrant to arrest Plaintiff. The standard is not now, nor was it then, whether Defendant had enough evidence to secure Plaintiff's conviction. Holmes, 341 F.3d at 1079. Therefore, Plaintiff is unable to establish that his arrest was unreasonable and in violation of his Fourth Amendment rights.

With regard to Plaintiff's Fourth Amendment claim of malicious prosecution, Plaintiff is again unable to demonstrate an unreasonable seizure that gives rise to the cause of action. Even though the Clayton County Solicitor dismissed the charge against Plaintiff, Plaintiff cannot show that he states any claim upon which relief can be granted. As set forth above, Defendants' arrest of Plaintiff was not a guarantee of a conviction. Holmes, 321 F.3d at 1079.

With respect to Plaintiff's Fourth Amendment claim at paragraph 63 of his Complaint that Defendants' conduct caused him to incur economic damages, the record is devoid of any evidence to substantiate this claim. Plaintiff suffered no loss of employment or income because of Defendants' alleged wrongful acts. In fact, Plaintiff admitted that his income was not affected at the time of his arrest, but has, in fact, increased since January 2005. (Exhibit "A", Resp. Number 8; Tuggle Depo. pp. 74-76).

As for Plaintiff's claim of suffering, emotional distress, anxiety, humiliation, outrage and loss of reputation (Complaint ¶ 64), those claims are also without merit. First, as set forth above, Defendants had probable cause to apply for the arrest warrant. Plaintiff made two (2) calls laced with profane and threatening language. Second, Plaintiff had been arrested on two

(2) earlier occasions for engaging in violent behavior. (Exhibit "N"). In other words, Plaintiff's reputation, if one can objectively state that he had any, was that of a violent person. In any event, Plaintiff's "damaged" reputation did not prevent him from obtaining new employment and salary increases.

Again, to the extent that the Court might construe that Plaintiff has brought a claim of unlawful seizure or false arrest, such a claim is properly analyzed under the Fourth Amendment's reasonableness standard. This analysis requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests alleged to justify the intrusion." <u>Tennessee v. Garner</u>, 471 U.S. 1, 8, 105 S.Ct. 1694 (1985), quoting <u>U.S. v. Place</u>, 462 U.S. 696, 703 (1983).

The constitutional standard applicable to false arrest claims is whenever an individual asserts a claim for wrongful arrest, qualified immunity will shield the defendant officers from suit if a reasonable officer could have believed the arrest at issue to be lawful, in light of clearly established law and the information the arresting officers possessed. Even law enforcement officials who reasonably, but mistakenly, conclude that

probable cause is present are entitled to immunity. <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658, 98 S.Ct. 2018 (1978).

The Eleventh Circuit has held that courts should consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." <u>Gilmere v. City of Atlanta</u>, 774 F.2d 1495, 1502 (11th Cir. 1985), <u>cert. denied</u>, 476 U.S. 1115 (1973).

In this case, Defendants clearly acted in accordance with the situation presented on January 4, 2005. The mere fact that Plaintiff went through the ordeal of being arrested and suffered an elevation of his blood pressure does not lend credibility to Plaintiff's claim. The "scope of the particular intrusion" must be viewed in light of the clear facts. Those facts show that Plaintiff's conduct presented Defendants with no alternative but to seek the arrest of Plaintiff. Focusing only on the extent of Plaintiff's discomfort is not the standard to apply when examining the reasonableness of Defendants actions.

The reasonableness of Defendants' actions is further demonstrated by the fact that those persons listening to Plaintiff's tone in the audiotaped message felt that the Plaintiff's voice sounded shaky, angry and extremely

upset. (Hanner Depo. p. 18). The tone of the voice message indicated a "meanness in the tone". (Antoine Depo. p. 30). Plaintiff's tone, coupled with the fact that Sheriff Hill was in the midst of making decisions regarding which employees would be kept or terminated, made Defendants' (and the other employees') decision to prevent any violence on Plaintiff's part even more understandable. Furthermore, as stated above, Sheriff Hill was aware of the assassination of DeKalb County Sheriff-elect Derwin Brown. (Hill Depo. p. 101). Like Sheriff Hill, Sheriff-elect Brown's campaign had been contentious and had promised reform. Therefore, if Sheriff Hill and his staff felt a potential problem with Plaintiff existed, then Sheriff Hill did nothing improper when he told his staff to have Plaintiff arrested.

**C.** **Sheriff Hill and Deputy Sheriff Borrelli, In Their Individual and Official Capacities, Are Entitled To Qualified Immunity.**

Even if Plaintiff could survive the proof requirements of a constitutional violation, Defendants are entitled to qualified immunity from liability in their individual and official capacities. The doctrine of qualified immunity is intended to protect government officials from liability if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v.

Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). Qualified immunity protects all except those who are plainly incompetent or who knowingly violate the law. Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986).

Because qualified immunity shields actors in all but exceptional cases, courts should, it has been opined, think long and hard before stripping defendants of immunity. Lassiter v. Alabama A&M University, 28 F.3d. 1146, 1149 (11th Cir. 1994). The applicability of the qualified immunity defense is a question of law, and as such, the issue is appropriately decided by a court on summary judgment. Barts v. Joyner, 865 F.2d 1187, 1189, reh'g denied, 871 F.2d 1122 (11th Cir.), cert. denied, 110 S. Ct. 101 (1989) (citing Harlow, 457 U.S. at 818, 102 S. Ct. at 2738).

The Supreme Court set up a bright-line test for a defendant's use of qualified immunity: a government official is entitled to qualified immunity unless the plaintiff can show that "'the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, ... the law clearly proscribed the actions the defendant took.'" Barts, 865 F.2d. at 1190 (quoting Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S. Ct. 2806, 2816).

It is clear that once an officer has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff. Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). General propositions of constitutional violations are not sufficient for a plaintiff to overcome his burden. Barts, 865 F.2d. at 1190; see also Lassiter, 28 F.3d 1146 (11th Cir. 1994).

The Eleventh Circuit recently stressed that for "qualified immunity to be surrendered, pre-existing law must dictate, that it, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Williamson v. Mills, 65 F.3d 155,157 (11th Cir. 1995) quoting Lassiter, 28 F.3d at 1150.

In Hope v. Pelzer, 122 S.Ct. 2508 (2002), the Supreme Court restated the qualified immunity standard, holding that the district court must make a determination of whether previous Eleventh Circuit or Supreme Court case law provided "fair warning" to a police officer that his actions were clearly unlawful. In the case at bar, no Eleventh Circuit or Supreme Court case law provided "fair warning" to Sheriff Hill or Deputy Borrelli that their actions were clearly unlawful.

For purposes of qualified immunity in this case, the only question that the Court must address is "whether, viewing the facts in a light favorable to the non-movant, there was **arguable probable cause** for the arrest." <u>Moore v. Gwinnett County</u>, 967 F.2d 1495, 1497 (11th Cir. 1992) See also, <u>Montoute v. Carr</u>, 114 F.3d at 184. "Because only arguable probable cause is required, 'the inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed.'" <u>Montoute</u> at 184. <u>See</u> <u>also</u>, <u>Eubanks v. Gerwen</u>, 40 F.3d 1157, 1160 (11th Cir. 1994) (which held that the question "whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law.").

The question that this Court should ask is whether Hill and Borrelli had arguable probable cause to believe that Plaintiff made harassing telephone calls. The specific qualified immunity inquiry is: **whether Defendants had information in their possession showing that the crime of making harassing telephone calls by Plaintiff had been committed and had arguable probable cause to arrest Plaintiff for committing the**

**crimes?**  Despite Plaintiff's bluster in his Complaint, Plaintiff can point to no relevant law that would have given these Defendants fair warning that, *in those circumstances*, arresting Plaintiff would have violated Plaintiff's constitutional rights.  Here, Deputy Borrelli believed, as would any other reasonable police officer, that probable cause existed based on Plaintiff's conduct, conduct which at least three other persons (Antoine, Hanner and Ruth) witnessed in some form.

Indeed, even assuming for purposes of this Brief alone that probable cause did not exist for the arrest (which it clearly did), Defendants are nevertheless entitled to qualified immunity. As the Supreme Court has held,"[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227 (1991).   The facts show that Defendants, particularly Borrelli, carefully considered their actions before going to the Chief Magistrate.  Their actions, even if mistaken, were reasonable and prevent liability from being heaped upon Defendants.

**D.** **Sheriff Hill and Deputy Sheriff Borrelli Are Entitled To Qualified Immunity With Respect To Plaintiff's First Amendment Claim.**

Defendants are entitled to qualified immunity as to Plaintiff's First Amendment claim. It is well-established that a police officer effectuating a lawful arrest will not be subject to liability under the First Amendment of the United States Constitution. Redd v. City of Enterprise, 140 F.3d 1378 (11th Cir. 1998).

In Redd, the Eleventh Circuit reversed the district court's denial of summary judgment for a group of police officers. The facts in Redd show that the plaintiffs were arrested for disorderly conduct because they were preaching loudly on a public sidewalk, near a busy intersection. In correcting the earlier decision of the district court, the Eleventh Circuit concluded that the officers were entitled to qualified immunity because they had arguable probable cause to believe that plaintiffs were committing the offense of disorderly conduct. The Court further held that plaintiffs' arrests were not a form of selective prosecution against religious speech. As long as it is established that the police officers did not knowingly or carelessly violate established law, qualified immunity will work as a shield against liability. See also, Dahl v. Holley, et al, 312 F.3d 1228 (11th Cir. 2002); J.S., a minor child, et al. v. Campbell, 2006 U.S. Dist. Lexis 72943 (October 5, 2006).

As asserted above, Defendants had probable cause to arrest Plaintiff. Therefore, Sheriff Hill and Deputy Sheriff Borrelli are shielded by qualified immunity from Plaintiff's First Amendment claim. As in <u>Redd</u>, a free speech claim will not override a police officer's ability to make a lawful arrest if there is probable cause to believe that a plaintiff has committed a crime.

Plaintiff herein committed a crime. Plaintiff has admitted that he made calls to the Sheriff's Office and used profane and to some, threatening language. In light of the circumstances of that day, the arrest was proper. As such, the First Amendment claim fails.

## IV. <u>CONCLUSION</u>

Based on the foregoing reasons, Defendants Victor Hill and Joanne Borrelli are entitled to summary judgment on each of Plaintiff's claims. There exists no genuine issues as to any material fact to be tried. The facts show that Defendants had probable cause to act in the manner they did on January 4, 2007, that their actions were reasonable and that they are protected by qualified immunity.

This the 5th day of January, 2007.

Respectfully submitted:

JAMES E. DEARING, JR., P.C.

/s/ James E. Dearing, Jr.
James E. Dearing, Jr.
Georgia Bar No. 215090
jdearing@jed-law.com

/s/ Lynn Wood
Lynn Wood
Georgia Bar No. 626153
lwood@jed-law.com
Attorneys for Defendants
Victor Hill and Joanne Borrelli

730 Peachtree Street, N.E.
Suite 560
Atlanta, Georgia 30308
(404) 780-0010
(404) 780-0008 fax

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| GEORGE MARK TUGGLE, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | FILE NO. 1:06CV-00272-ODE |
| | : | |
| CLAYTON COUNTY SHERIFF | : | |
| VICTOR HILL, in both his | : | |
| Official and Individual | : | |
| Capacities, and | : | |
| DEPUTY SHERIFF JOANNE | : | |
| BORRELLI, | : | |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D)

Counsel for Victor Hill and Joanne Borrelli hereby certifies that the

foregoing Defendants Victor Hill and Joanne Borrelli's Motion for Summary

Judgment, Defendants Victor Hill and Joanne Borrelli's Statement of

Undisputed Material Facts to Which There Is No Genuine Issue To Be Tried

and Defendants Victor Hill and Joanne Borrelli's Brief in Support of Their

Motion for Summary Judgment have been prepared in compliance with

Local Rule 7.1(D) by using Times Roman font in 14 point type.

This the 5th day of January, 2007.


/s/ James E. Dearing, Jr.
James E. Dearing, Jr.
Georgia Bar No. 215090
jdearing@jed-law.com

/s/ Lynn Wood
Lynn Wood
Georgia Bar No. 626153
lwood@jed-law.com
Attorneys for Defendants
Victor Hill and Joanne Borrelli