# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| GEORGE MARK TUGGLE, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | FILE NO. 1:06CV-00272-ODE |
| | : | |
| CLAYTON COUNTY SHERIFF VICTOR HILL, in both his Official and Individual Capacities, and DEPUTY SHERIFF JOANNE BORRELLI, | : | |
| | : | |
| Defendants. | : | |

## STATEMENT OF MATERIAL FACTS WHICH SHOWS THAT THERE IS NO GENUINE ISSUE TO BE TRIED

COME NOW Defendants in the above-styled action, Clayton County Sheriff Victor Hill and Deputy Sheriff Joanne Borrelli, and file with the Court this their Statement of Material Facts Which Shows That There Is No Genuine Issue To Be Tried. In support thereof, Defendants state the following:

1.

Sheriff Hill took office on January 1, 2005, replacing Stanley Tuggle. (Hill Depo. p. 80). Sheriff Hill was not allowed any transition time from the

prior administration of Sheriff Tuggle to the start-up of his own administration. (Hill Depo. p. 105).

2.

The first day in the office for Sheriff Hill's employees was Monday, January 3, 2005. (Hill Depo. p.86; Antoine Depo. p. 18; Hanner Depo. p. 9).

3.

The first days in office for Sheriff Hill and his staff was a time to set up the new administration. It was a very hectic time. There were a lot of new people and a lot of activity in and around the Sheriff's Office. (Hill Depo. p. 107; Borrelli Depo. p. 74) The new, and even the current, employees were uncertain as to their eventual assignments. There were many people coming in and out of the Sheriff's office. (Hanner Depo. p. 45; Ruth Depo. p. 8; Borrelli Depo. p. 74).

4.

On Monday, January 3, 2005, Sheriff Hill's first day in the office, a number of deputies were terminated from employment with the Clayton County Sheriff's Office. (Hill Depo. p. 91; Hanner Depo. p. 11; Antoine Depo. p. 21).

5.

When Sheriff Hill took office, he was mindful of another Atlanta metropolitan area sheriff who had been murdered shortly before he took office -- Sheriff Derwin Brown of DeKalb County. (Hill Depo. p. 101).

6.

On Monday evening, January 3, 2005, at approximately 6:20pm, Captain Jon Antoine, who had been selected as the Sheriff's head of internal affairs, answered the Sheriff's Office phone line. (Antoine Depo. p. 28). The caller asked to speak to Sheriff Hill. Antoine advised the caller that the Sheriff was in a meeting and asked whether the caller wanted to leave a message. (Antoine Depo. p. 28). The caller identified himself as Mark Tuggle, the Plaintiff herein. Plaintiff left a telephone number for a return call and then told Antoine that firing those people was low. (Clayton County Sheriff's Office Statement Form dated January 4, 2005 of Jon Antoine, attached hereto as Exhibit "C"). Plaintiff referred to Sheriff Hill as "scum". (Tuggle Depo. p. 33). Plaintiff further stated, when advised that the Sheriff was in a meeting, that "it can't be much of a meeting" if Sheriff Hill was conducting it. (Tuggle Depo. p. 47).

7.

Plaintiff called the Sheriff's Office back less than 15 minutes after the first call and got the Sheriff Office's automated answering service. (Tuggle Depo. p. 39). In this voice message, Plaintiff left his name and number and said that he wanted a meeting with that "short little bastard Sheriff of ya'lls". (Tuggle Depo. p. 37).

8.

Plaintiff admitted that there was almost no time between the first and second phone calls to the Sheriff. (Tuggle Depo. p. 39).

9.

The next morning, Tuesday, January 4, 2005, Patricia Ruth, Sheriff Hill's new secretary, was retrieving voicemail messages at her desk located in the Sheriff's reception area. (Ruth Depo. p. 15). The first message on the voicemail was that of Plaintiff, who identified himself, and said that he wanted a meeting with the "short little bastard Sheriff of ya'lls." (Ruth Depo. p. 14; Tuggle Depo. p. 31; Borrelli Depo. p. 84).

10.

As soon as she heard the profanity, Ms. Ruth immediately handed the phone to Jon Antoine to listen to the message. (Ruth Depo. p. 19-20).

11.

On that day, Phillip Hanner was a newly hired lieutenant with Internal Affairs at the Clayton County Sheriff's Office. (Hanner Depo. p. 8). Hanner was one of the employees in the Sheriff's Office that morning. (Hanner Depo. p. 14).

12.

Hanner and Antoine, and possibly several others, heard the voice mail message replayed that morning and were concerned due to the Plaintiff's tone and the frequency of the calls. (Hanner Depo. p. 18; Ruth Depo. p. 20).

13.

The caller's voice sounded shaky, angry and extremely upset. (Hanner Depo. p. 18).

14.

The tone of the voice message indicated a "meanness in the tone". (Antoine Depo. p. 30).

15.

Patricia Ruth perceived the message as a threat to the Sheriff (Ruth Depo. p. 35).

16.

Sheriff Hill was advised of the voicemail message. (Antoine Depo. p. 35).

17.

The Sheriff said "I want him locked up." (Borrelli Depo. p. 95; Hanner Depo. p. 27). According to Hanner, he understood the Sheriff's instructions to mean that the appropriate procedures and policies were to be followed in investigating this incident with Plaintiff. Based upon his nine (9) years of experience at the time, Hanner did not interpret Hill's instructions to mean that special measures regarding Plaintiff were to be taken. (Hanner Depo. p. 39).

18.

Sheriff Hill told Antoine to handle the incident with Plaintiff like any other matter. (Hill Depo. p. 152).

19.

Hanner was directed by someone, it is not clear whom, to get the recording equipment to record a copy of the message. (Hanner Depo. p. 21). An audiotape copy of the message was made. (Hanner Depo. p. 21).

20.

Plaintiff's voice message was then played for Deputy Sheriff Joanne Borrelli. (Hanner Depo. p. 22).

21.

Borrelli was a deputy sheriff with the Sheriff's Office and was assigned to the Sheriff's suite on January 4, 2005, as a security officer. (Borrelli Depo. p. 70)

22.

Borrelli was asked to write the incident report and to fill out the application for the warrant by one of her supervisors, Hanner. (Borrelli Depo. p. 77).

23.

Borrelli gathered all the facts, including the statement of Antoine, reviewed the statute and followed the procedure that she would have followed any other time and with any other person and presented it to a third party for review. (Borrelli Depo. p. 119).

24.

Borrelli typed the report based on the audiotape of the second phone call and Antoine's report of the first call. (Borrelli Depo. p. 94). Borrelli completed the Application for Criminal Arrest Warrant. (Exhibit "D").

25.

Borrelli then went with Hanner to the Chief Magistrate Judge's office. (Borrelli Depo. p. 128; Hanner Depo. p. 23). Borrelli took a copy of the audiotape, along with the Application for the warrant. Borrelli presented the facts of the case to the Chief Magistrate Judge. (Borrelli Depo. p. 96).

26.

The Judge played and listened to the audiotape. (Borrelli Depo. p. 128). Hanner was not present in the Judge's private office during this time. Hanner waited in the Judge's reception area. (Hanner Depo. p. 23).

27.

After reviewing the Application and considering the evidence, the Judge issued two warrants for harassing phone calls. (Exhibits "E" and "F"; Borrelli Depo. p. 96).

28.

A deputy sheriff assigned to the Warrants Division, Eddie Hall, called Plaintiff's house to advise the Plaintiff that there was a warrant for his arrest. (Borrelli Depo. p. 47).

29.

Plaintiff's wife called Plaintiff at work to advise him of same. (Tuggle Depo. p. 52).

30.

Plaintiff called the Sheriff's office to advise that he would turn himself in later that day. (Tuggle Depo. p. 54; Borrelli Depo. pp. 47-48). Chief William Cassells, the second in command to Sheriff Hill, was told of Plaintiff's decision to turn himself in at a later time and found the offer unacceptable. Cassells said that Plaintiff would turn himself in within the hour or deputies would be sent to his work to pick him up. (Tuggle Depo. p. 54). Plaintiff turned himself in. Borrelli, Southerland and Cassells went down to the visitor's entrance of the Sheriff's entrance at the Clayton County Courthouse to meet Plaintiff (Borrelli Depo. p. 134). Plaintiff was asked to put his hands behind his back and handcuffed. (Borrelli Depo. p. 134).

31.

Borrelli turned Plaintiff over to the corrections officer at intake and left. (Borrelli Depo. p. 136).

32.

Medical services at the Clayton County Jail are handled on a contract basis by Georgia Correctional Health, LLC, a medical care provider. The medical staff at the Jail are employees of Georgia Correctional Health, LLC.

33.

At booking, Plaintiff's blood pressure was taken by a medical assistant at medical screening. His blood pressure was very high. (Blood Pressure Record, Exhibit "G").

34.

Tina McGee, a licensed practical nurse ("LPN") at intake, called the nurse in charge who came over and took care of Plaintiff because his blood pressure was so high. (Sworn Statement of Tina May McGee, dated December 18, 2006, p. 7, attached hereto as Exhibit "H").

35.

The nurse in charge was Pauline Thomas, a registered nurse ("RN"). Ms. Thomas was advised that there was an inmate with very high blood pressure. (Sworn Statement of Pauline Thomas, dated December 18, 2006, p. 7, attached hereto as Exhibit "I").

36.

Nurse McGee reported that Plaintiff's blood pressure was very high, dangerously high, at 230 over 120. (Exhibit "H").

37.

Plaintiff was given the appropriate medication for his high blood pressure, was rechecked an hour later, and then booked in by having his fingerprints and photograph taken. (Exhibit "H").

38.

Daina Matheny was the licensed practical nurse ("LPN") in the infirmary at the jail and was one of the nurses caring for Plaintiff. Matheny checked Plaintiff's blood pressure and admitted him into the infirmary. (Sworn Statement of Daina Matheny dated December 18, 2006, pp. 6-7, attached hereto as Exhibit "J").

39.

Linda Faulkner is a family nurse practitioner and was working at the Clayton County Jail during Plaintiff's incarceration. Faulkner says she saw Plaintiff on January 5, 2005. According to her notes, Plaintiff's blood pressure was very high, that the medical staff treated him and that she examined him. (Progress Notes of Georgia Correctional Health, LLC, dated January 4 and 5, 2005, attached hereto as Exhibit "K").

40.

Faulkner stated further that Plaintiff told her that he had been told in the past that he had hypertension but he had never taken any medicine to

treat it. (Sworn Statement of Linda Faulkner dated December 18, 2006, p. 11, attached hereto as Exhibit "L"). Faulkner says that Plaintiff was noticeably overweight, by more than thirty (30) pounds. (Exhibit "L", Faulkner Sworn Statement, pp. 12-13).

41.

Plaintiff denied having any chest pain, shortness of breath or headache. (Exhibit "L", Faulkner Sworn Statement, p. 12).

42.

None of the medical professionals noted on any records at the infirmary that Plaintiff was being abused, harassed or shouted at by any sheriff's deputies. (Exhibit "L", Faulkner Sworn Statement, pp. 14-15; Exhibit "I", Thomas Sworn Statement, pp. 11-13; Exhibit "J", Matheny Sworn Statement, pp. 7-8).

43.

There was nothing unusual in the manner in which sheriff's deputies were interacting with Plaintiff. (Exhibit "H", McGee Sworn Statement, p. 10-11).

44.

There was no shouting at or intimidation of Plaintiff. (Exhibit "J", Matheny Sworn Statement, p. 7-8).

45.

If there had been shouting or abusive behavior directed toward Plaintiff, the nurses would have written down their observations in their notes. (Exhibit "I", Thomas Sworn Statement, p. 12; Exhibit "J", Matheny Sworn Statement, p. 10).

46.

Plaintiff was cooperative and, therefore, there appeared to be no need for deputies to hover around him. (Exhibit "L", Faulkner Sworn Statement, p. 15; Exhibit "H", McGee Sworn Statement, p.12; Exhibit "I", Thomas Sworn Statement, p. 8).

47.

There is no evidence that any nurse "took charge" or had to "intervene" with deputies for Tuggle to get the proper care. (Exhibit "I", Thomas Sworn Statement, p. 12; Exhibit "J", Matheny Sworn Statement, pp. 10-11; Exhibit "H", McGee Sworn Statement, p. 11).

48.

It appears that Plaintiff was dressed in an orange jumpsuit after being booked in at the jail. (Borrelli Depo. p. 138). Orange is the color typically

assigned to the general population and red is the color for violent offenders. (Borrelli Depo. p. 137).

49.

Plaintiff bonded out 29 hours later. (Tuggle Depo. p. 87).

50.

Plaintiff's case was forwarded to the Solicitor's Office and dismissed prior to the filing of an accusation. (State Court of Clayton County, Order of Dismissal in Case No. 2005AD06082/2005SG06182, dated August 5, 2005, attached hereto as Exhibit "M".)

This the 5th day of January, 2007.

Respectfully submitted:

JAMES E. DEARING, JR., P.C.

/s/ James E. Dearing, Jr.
James E. Dearing, Jr.
Georgia Bar No. 215090
jdearing@jed-law.com

/s/ Lynn Wood
Lynn Wood
Georgia Bar No. 626153
lwood@jed-law.com
Attorneys for Defendants
Victor Hill and Joanne Borrelli

730 Peachtree Street, N.E.
Suite 560
Atlanta, Georgia 30308
(404) 780-0010
(404) 780-0008 fax