**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **GEORGE MARK TUGGLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION FILE** |
| | ) | |
| **CLAYTON COUNTY SHERIFF** | ) | **NO.:1:06-CV-0272-ODE** |
| **VICTOR HILL, in both his official** | ) | |
| **and individual capacities; and** | ) | |
| **DEPUTY SHERIFF JOANNE** | ) | |
| **BORRELLI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff

George Mark Tuggle ["Tuggle"] responds to the Defendants' Motion for Summary

Judgment by filing his *Brief in Opposition to Defendants' Motion for Summary*

*Judgment; Response to the Defendants' Statement of Material Facts To Which There*

*Is No Genuine Issue to be Tried;* and *Statement of Material Facts To Which There*

*Remains a Genuine Issue to Be Tried.*  For the reasons set forth herein, the

Defendants' Motion should be denied and this matter should be set for trial within

forty-five days after entry of the Court's order.

## I. INTRODUCTION

On January 3, 2004, Tuggle left two messages for Victor Hill at the Clayton County Sheriff's Office. He left his name. He left his phone number. Both times, he asked to meet with Victor Hill about Hill's vindictive terminations of twenty-seven employees of the Sheriff's Office. Tuggle did not get the meeting he requested. Instead, when Victor Hill got Tuggle's messages, he ordered, "**I want him locked up**."

At Hill's direction, Deputy Sheriff Joanne Borrelli dutifully documented the calls; mechanically marched down to the new magistrate; proudly presented her sworn affidavit; and promptly produced the first arrest warrants of Victor Hill's new administration: <u>two</u> warrants for Harassing Phone Calls.[1] Tuggle learned of the warrants and turned himself in. He spent twenty-nine hours in custody. Eight months later, the Solicitor General dismissed the charges.

Asked to comment on the dismissal, Victor Hill said,

> *He may have beat the rap, but he didn't beat the ride. I'm sure he won't be calling my office anymore.*

---

[1] Victor Hill is tough on crime. The actual elements of a criminal offense do not delay justice in his administration. O.C.G.A. 16-11-39.1 requires "repeated" calls "for the purpose of "annoying, harassing or molesting another." The two warrants, each alleging one phone call, were *per se* invalid.

(Atlanta-Journal Constitution, Thursday, Aug. 4, 2005, D6, attached hereto as Exhibit A).    Hill also made sure that Tuggle's "book-in" photograph appeared on the six o'clock news, just in case anyone else was inclined to voice criticism of the new sheriff in town.    His efforts to silence his critics succeeded.

> Q:    You have never been insulted by anyone, except for this one time?
>
> A:    No.  You have got to understand – how do I put this?  You have to understand I'm the sheriff of the County.  Not too many people are going to say anything like that to me.  He is the only one to do that, and violated the law.

(Hill Dep., p. 231).

It is a delicious irony that Victor Hill's own brash statement to the press amounts to a confession of the civil rights violations he now expects to have dismissed.  What better way to teach Victor Hill the meaning of the First Amendment than to make him eat his own words?

## II.    STATEMENT OF FACTS

As fate would have it, voters in the Clayton County Democratic primary elected Victor Hill as their new Sheriff in July of 2004.  Hill defeated the incumbent Sheriff, Stanley Tuggle, who happened to also be Mark Tuggle's brother.  (Hill Dep., pp. 56-57).  Mark Tuggle worked as his brother's media liaison, and exchanged e-mails with

Victor Hill during the campaign. (Tuggle Dep., p. 18). Mark Tuggle also ran across members of Hill's staff on the campaign trail. (Hill Dep., pp. 96-97; Antoine Dep., pp. 6-8).

Victor Hill took office on January 3, 2005. As his first official act, Victor Hill abruptly fired twenty-seven employees of the Clayton County Sheriff's Office. (Hill Dep., p. 91). According to the allegations in a lawsuit presently pending in this Court, Victor Hill fired these employees in part because they did not support his campaign. [*H.D. Massingale et al v. Victor Hill et al*, 1:05-CV-189-TWT]. The twenty-seven employees were escorted out of the Sheriff's Office under the watchful eye of sharpshooters positioned on the roof. The terminations made local news. (Tuggle Dep., pp. 85-86).

Mark Tuggle was a resident of Clayton County. (Tuggle Affidavit, attached hereto as Exhibit B, ¶ 2). As he watched the local news, Tuggle saw that Victor Hill had fired many of his close friends who had worked for his brother in the Sheriff's Office. (*Id.* ¶ 3). He had known some of these friends since high school. (*Id.* ¶ 4). He knew that they had wives, families and bills to pay at the end of the month. He was incensed that an elected official in Clayton County would treat good, hardworking public servants with such disrespect. (Tuggle Dep, pp. 32, 47, 85-86).

At approximately 6:17 p.m. on January 3, 2005, Tuggle called the switchboard at the Sheriff's Office. He got an answering machine, so he left the following message:

> **Sherry, this is Mark Tuggle. How 'bout calling me first chance you get. I'd like to get an appointment with that little, short lil' bastard sheriff of y'all's.**

(Tape of Mark Tuggle's Message 1/3/05 at 6:17 p.m., attached hereto as Exhibit C; Ruth Dep., pp. 13-15). Tuggle hung up.

He called back a few minutes later. (Tuggle Dep. pp., 39-40). Jon Antoine, a newly appointed member of Hill's command staff, answered the phone. (*Id*. at 38-39; Antoine Dep., 26). Antoine knew Tuggle from the campaign trail. Antoine described the conversation, as follows:

> **Sheriff's Office, can I help you?** I believe he said something along the lines of, *Is the Sheriff in?* I said, **No, he is not, can I take a message for him?** He said, *Yeah, this is Mark Tuggle.* Okay. **Do you want to leave a phone number? Yeah.** He leaves a phone number. And I said, **what's it in reference to?** And he said *about firing those people*, and *anybody who works for somebody firing those people are (sic) scum.* I said, **Well, I'll be sure to give him the message.**

(Antoine Dep., p. 28)(emphasis added).[2]  Tuggle did not sound angry to Antoine; he simply made his point.  (*Id*. at 30).  Antoine did not swear out a warrant or an incident report; he filled out a "While You Were Out" message slip for Victor Hill.  (Phone Message, attached hereto as Exhibit D; Antoine Dep., p. 31).

On January 4, 2005, Victor Hill's new assistant, Pat Ruth, retrieved Tuggle's message from the answering machine.  (Antoine Dep., p. 29).  Antoine also heard the message.  He played the message for Victor Hill and his newly appointed  Chief Deputy, Tee Cassells.  (Hanner Dep., p. 18-20).   Phillip Hanner ["Hanner"], another new appointee, was standing nearby.  Hanner testified, "after they played the message for the sheriff and for everybody who was in the suite, I recall the sheriff just matter of factly saying, **I want him locked up.**"  (*Id*. at 20) (emphasis added).

---

[2]     Antoine drafted a statement about his conversation with Tuggle on January 4, 2005, the day after Tuggle called.  In that statement, Antoine recalled the conversation as follows:

> The caller asked to speak to Sheriff Hill and I advised him that he was in a meeting and if he wanted to leave a message.  The caller stated that he was Mark Tuggle and that firing those people was low.  He was referencing to the dismissal of employees.  I recognized the voice to be that of Mark Tuggle.  He states that firing these people "who had families was low and whoever did that was scum!"  He did not stay on the line soon after making those statements.

(Borrelli Dep, Ex. 9).

When Victor Hill gave his order, three members of his new command staff were standing in his office – Cassells, Hanner and Antoine. But none of these senior officers took any affirmative steps to execute Victor Hill's order. Instead, they recruited Deputy Joanne Borrelli to secure an arrest warrant for Tuggle. (*Id*. at 20; Borrelli Dep., p. 77). As Borrelli recalled,

> I was pulled into the office by Philip Hanner and briefed on the facts of the case and was told that the sheriff wanted him locked up and I was to assist in the report writing.

(Borrelli Dep., p. 77). Borrelli was afraid that she would be disciplined for insubordination if she did not obey Victor Hill's order. (*Id*. at 78, 94-95).

Borrelli logged onto the Sheriff's Department computer system and drafted an Incident Report. She did not get statements from Antoine, Ruth or Hanner.[3] She did not talk to Hill, the "victim" of the purported crime. (*Id.* at 84, 95, Ex. 8).[4] Borrelli's entire investigation consisted of listening to the tape of Tuggle's first message. (*Id*. at 84).

---

[3] Antoine gave Borrelli a statement **after** she completed her report. (Borrelli Dep., p. 85). Borrelli's failure to investigate may explain why the report is riddled with errors. Specifically, Borrelli incorrectly recorded the dates of the calls. (Id, Ex. 8).

[4] Borrelli's best explanation for her failure to speak with her victim about the purported crime was that it was not a "normal day." (*Id*. at 95).

Borrelli used her report to prepare her warrant application. She presented her application to the newly elected Magistrate Judge Daphne Walker.[5] (*Id*., Ex. 11). Borrelli's application was materially misleading in at least two respects. Borrelli's application stated that Tuggle made calls on January 3rd and 4th. (*Id*.). Borrelli's application also mischaracterized Antoine's recollection of his conversation with Tuggle. Borrelli averred that, "Mr. Tuggle did call the Sheriff 'low down scum'." (*Id. compare*, Antoine Dep., p. 28; Borrelli Dep., Ex. 9). The Magistrate signed two arrest warrants for purported violations of O.C.G.A. § 16-11-39.1 – Harassing Phone Calls. (Borrelli Dep., Exs. 12, 13).

At the direction of Victor Hill, the highest ranking law enforcement official in Clayton County, Borrelli submitted a sworn application for these arrest warrants knowing that: (1) Tuggle only called two times; (2) Tuggle had not threatened bodily harm; and (3) Tuggle had called to schedule a meeting to discuss Victor Hill's termination of twenty-seven former employees. (Borrelli Dep., pp. 61, 97-98; Hill Dep. pp. 214-215; Hanner Dep., p. 20).

---

[5] Magistrate Walker and Sheriff Hill both began their terms in their newly elected positions in January 2005. (See Clayton County Official Results dated July 20, 2004, attached hereto as Exhibit F; Newly Elected Judges (1/105), www.georgiacourts.org/aoc/publications/new, attached hereto as Exhibit G).

Clayton County had ten thousand outstanding warrants on January 4, 2005, but Tuggle's immediate arrest became a high priority. (Hill Dep., p. 189-190; Borrelli Dep., pp. 87-88). Deputies first appeared at Tuggle's home. (Tuggle Dep., p. 53). When Tuggle's wife told them that Tuggle was at work, the deputies called Tuggle. (*Id*. at 53-54). Tuggle asked them if he could turn himself in after work. (*Id*.). The deputies told Tuggle that Chief Cassells wanted him to turn himself in within the hour or a deputy would be sent to his workplace. (*Id*. at 54). Tuggle left work and drove to the Clayton County jail. (*Id*.).

When Tuggle arrived, Chief Cassells, Borrelli, and Borrelli's husband, who also worked for the Sheriff, took Tuggle into custody. (Borrelli Dep., pp. 134-136). Cassells stated that Tuggle was to be placed in general population. (Tuggle Dep., p. 62).[6] Tuggle was given an orange jumpsuit. (Tuggle Aff, ¶5). Serious offenders housed in the Clayton County Detention Center wear orange jumpsuits. (Borrelli Dep., p. 137). Misdemeanor inmates typically wear yellow jumpsuits. (*Id*.). After

---

[6]     Asked whether he had any concerns about housing Tuggle – the brother of the man who had been serving as sheriff just four days earlier – in general population, Victor Hill replied, ***"He wasn't the former sheriff, so what difference would it make? If he was the actual sheriff, that might be an issue. He was just a brother of the sheriff. Peoples' brothers and sisters go to jail all the time.***" (Hill Dep., p. 184).

taking Tuggle's "book in" photograph in the orange jumpsuit, officers told him to change into a yellow jumpsuit. (Tuggle Aff, ¶6). The Clayton County Sheriff's Office released Tuggle's "book in" photograph to the media. (Tuggle Aff, ¶7).

Nurses working for Correct Health, a private contractor, treated Tuggle in Intake and immediately noticed that his blood pressure was very high. (Intake Screening Process Notes, attached hereto as Exhibit H). Worried that Tuggle might suffer a stroke, the nurses placed him in the infirmary on medical watch. (Tuggle Aff, ¶8). Twenty-nine hours after his arrest, Tuggle was released on bond. (Tuggle Dep., pp. 87-88).

On August 5, 2005, the Solicitor for Clayton County dismissed the charges against Tuggle. (Dismissal, attached hereto as Exhibit I). The Solicitor explained that the statute requires "repeated" calls, which she defined as "more than two but not many." (*Id*.). The Solicitor based her decision to dismiss solely on the number of times Tuggle called, without commenting on the purpose of his calls. (*Id*.).

## III. ARGUMENT & CITATION OF AUTHORITIES

The Court should initially consider whether the Defendants' Motion for Summary Judgment presents the rare circumstance where a defendant fails to meet the initial burden at the summary judgment stage. *See, e.g., Celotex Corp. v. Catrett,*

477 U.S. 317, 325, 106 S.Ct. 2548 (1986) (the movant carries the initial burden to show the Court that there is "an absence of evidence to support the nonmoving party's case.")     Whole sections of Defendants' Brief have no bearing at all on any issues – factual or legal – in this matter.[7]   Defendants even manage to move for summary judgment on non-existent claims; Tuggle has no independent Fourteenth Amendment claim – the First and Fourteenth Amendment claims are actionable against state officials through the Fourteenth Amendment. *Chesser v. Sparks*, 248 F.3d 1117, 1121 n.5 (11th Cir. 2001).

Tuggle has actually alleged three distinct civil rights violations arising from his unlawful arrest, detention and prosecution by the Defendants:   (1) retaliatory prosecution in violation of the First Amendment; (2) false arrest in violation of the Fourth Amendment; and (3) malicious prosecution in violation of the Fourth Amendment. The relevant evidence supporting Tuggle's claims is overwhelming and

---

[7]     Pages 1-7 and 14-18 of Defendants' Brief recite "facts" that have nothing whatsoever to do with Tuggle's constitutional claims.  *See, e.g.*, *Davis v. Williams*,451 F.3d 759, 762   (11th Cir. 2006)(the only relevant facts and circumstances are those "known to the officer(s), . . . of which he or she has reasonably trustworthy information").   The Defendants' strategy is a bit contrived:  to cast themselves as the  "good guys" and Tuggle as the "bad guy."  What other explanation could there be for highlighting Tuggle's prior arrest history, much less his inability to read beyond a first grade level?

largely undisputed.  A fair-minded jury will have little trouble returning a substantial verdict in Tuggle's favor.  As for qualified immunity, the Court should likewise have no trouble concluding that the Defendants had "fair warning" that Tuggle's arrest, detention and prosecution violated the Constitution.

## A.    RETALIATORY PROSECUTION

In his second official act as Sheriff of Clayton County, Hill ordered his subordinates to "lock [Tuggle] up" so that he would learn to "not to call my office anymore."    The Constitution prohibits such arbitrary abuses of power.  As the Supreme Court observed nineteen years ago,

> The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.

*Houston v. Hill*, 482 U.S. 451, 462-63, 107 S.Ct. 2502 (1987).

To prove his claim that the Defendants retaliated against him for expressing his views about Hill's termination of  twenty-seven law enforcement officers, Tuggle must allege facts that would permit a jury to find that:  (1) his speech was constitutionally protected; (2) that the Defendants' arrest, detention and prosecution of Tuggle would likely deter a person of ordinary firmness from the exercise of First

Amendment rights; and (3) a causal connection between the retaliatory actions and the adverse effect on speech. *Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005).[8]

### 1.   PROTECTED SPEECH

The undisputed evidence demonstrates that Tuggle was a lifelong citizen of Clayton County, with close ties to many veterans in the Clayton County Sheriff's Office.   When Victor Hill fired twenty-seven of those veterans, at the point of a sharpshooters' rifle, Tuggle exercised his rights as a citizen by expressing his opinion about Victor Hill's actions.  Tuggle made two calls to Victor Hill's office.  Each time, he identified himself, asked for a meeting and left his phone number.   When Antoine asked why he wanted to meet with Hill, Tuggle replied, "firing those people was low and anyone who worked for someone like that was scum." (Antoine Dep. p. 28).   In his first message, he said he wanted an appointment with that "short lil' bastard Sheriff of y'all's." (Ex. C). Tuggle's speech falls squarely within the broad protections of the First Amendment.

---

[8]     Just as in *Hendrix*, there is no indication that the Defendants would have arrested, detained and prosecuted Tuggle in the absence of his two phone calls to the Sheriff's Office on January 3, 2004.  Thus, Tuggle need only address the first two prongs of his *prima facie* case of retaliation.

For over fifty years, the Supreme Court has consistently held that,

> speech is often provocative and challenging . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a *clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest.*

*City of Houston v. Hill*, 482 U.S. 451, 461, 107 S.Ct. 2502 (1987) quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894 (1949) (emphasis added). In the specific context of police/citizen encounters, the Court has afforded even greater latitude under the First Amendment. "The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Hill*, U.S. at 461. Accordingly, the First Amendment does not permit states to "provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them." Id. at 465; *see also Norwell v. City of Cincinnati*, 414 U.S. 14, 16, 94 S.Ct. 187 (1973) (overturning conviction under disorderly conduct statute where "petitioner was arrested and convicted merely because he verbally and negatively protested an officer's treatment of him").

Tuggle's messages certainly did not rise to the level of "fighting words" or otherwise create a "clear and present danger" of any sort of "serious substantive evil." *See, e.g.*, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766 (1942). By

his own admission, Victor Hill dismissed Tuggle's messages as mere annoyances. (Hill Dep., pp. 217, 228, 234). Referring to a law enforcement officer as a "short lil' bastard" in a telephone message simply cannot justify punishment by a state official under the First Amendment. *See, e.g.*, *Sweatt v. Bailey*, 876 F.Supp. 1571, 1580 (M.D. Al. 1995) (calling a law enforcement officer an "ass" within his earshot not "fighting words"); *Hancock v. Hobbs*, 967 F.2d 462, 469 (11th Cir. 1992) (adopting view that use of profanity toward an arresting officer is protected speech); *Buffkins v. City of Omaha*, 922 F.2d 465, 472 (8th Cir. 1990), *cert. denied*, 502 898, 112 S.Ct. 273 (1991) (use of the word "asshole" could not reasonably have prompted a violent response from the arresting officer).

In an ideal world, Tuggle would have been perfectly polite in his messages. But the First Amendment's reach extends well beyond gentle remonstrations against public officials by polite people.

> If absolute assurance of tranquility is required, we may as well forget about free speech. Under such a requirement, the only "free" speech would consist of platitudes. That kind of speech does not need constitutional protection.

*Spence v. Washington*, 418 U.S. 405, 416, 94 S.Ct. 2727, 2733 (1874) (Douglas, J. concurring) *cited in Hill*, supra at 463, n.11. Tuggle may have been impolite, even

rude, in delivering his messages for Victor Hill. The First Amendment, however, demands that Victor Hill tolerate such provocative speech without succumbing to "[t]he eternal temptation . . . to arrest the speaker rather than to correct the conditions about which he complains. *Younger v. Harris*, 401, U.S. 37, 65, 91 S.Ct. 746 (1971) (Douglas J. dissenting).

### 2. ADVERSE ACTION

In *Bennett v. Hendrix*, supra, the Eleventh Circuit held that a person asserting a claim of retaliatory prosecution suffers an adverse action "if the Defendants alleged retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Hendrix*, 423 F.3d at 1254. The Defendants' arrest, detention and criminal prosecution of Tuggle meets this objective standard.

In *Hendrix*, the Eleventh Circuit found that "instances where the defendants followed, pulled over, cited, intimidated, or otherwise harassed the Plaintiffs," and "*attempted* to obtain arrest warrants against [them] without probable cause" would suffice to deter a person of ordinary firmness from exercising their First Amendment rights. *Id.* at 1254-55; (emphasis added); *see also*, *Garcia v. City of Trenton*, 348 F.3d at 729 (the retaliatory issuance of parking tickets totaling $35 created a jury issue because the defendant "engaged the punitive machinery of government in order

to punish Ms. Garcia for her speaking out").  Victor Hill knew full well that arresting Tuggle would stop him from calling the Sheriff's Office.  His own admission bears repeating, *"[h]e may have beat the rap, but he didn't beat the ride.  I'm sure he won't be calling my office anymore*."  (Ex. A).  Tuggle's arrest, detention and prosecution constitutes an adverse action for First Amendment purposes and, as there is no disputed issue regarding causation, summary judgment must be denied. *See, infra,* p 13, n. 8.

### B.    FALSE ARREST

Tuggle was arrested pursuant to a warrant; therefore, his Fourth Amendment claims are controlled by the Supreme Court's decision in *Malley v. Briggs*, 475 U.S. 335, 344 106 S. Ct. 1092 (1986); *see, e.g., Garmon v. Lumkin County*, 878 F.2d 1406 (11th Cir. 1989); *Jones v. Cannon et al*, 174 F.3d 1271 (11th Cir. 1999).  In *Malley*, *supra*, a state patrolman, acting pursuant to a court-authorized wiretap on a third-party's telephone,  monitored two phone calls that implicated the plaintiffs in illicit drug use. *Malley*, 475 U.S. at 337-38.  Based on these two calls, the state patrolman applied for two felony warrants for conspiracy from a magistrate.  The plaintiffs' arrests were published in local and statewide newspapers.   The charges were

dismissed, and the plaintiffs sued alleging violations of their Fourth Amendment rights. *Id.*

The Supreme Court held that an officer applying for a warrant will be protected by qualified immunity, unless "*on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue.*" *Id.* at 341. The Court explained the pertinent inquiry as follows:

> whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.

*Id.* at 345. The Court also concluded that a magistrate's subsequent decision to issue the warrant affords no protection to the officer. Instead, the Court held that, "[w]e find it reasonable to require the officer applying for the warrant to minimize this danger[9] by exercising reasonable professional judgment." *Id.*

Cases subsequent to *Malley* focus principally on whether the officer seeking a warrant made "knowingly or recklessly false, or materially misleading statements to support a warrant;" however, *Malley* actually contemplates a two fold inquiry. *See, e.g.*, *Garmon*, 878 F.2d at 1410-11; *Kelley v. Curtis*, 21 F.3d at 1554; *Jones v.*

---

[9] "[T]his danger" refers to the subject of the previous sentence. "But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should." *Id.*

Cannon, 174 F.3d at 1285 (11th Cir. 1999). The Court should consider whether the officer has made "knowingly or recklessly false statements" in the warrant application, but must also consider whether the warrant application "is so lacking in indicia of probable cause as to render official believe in its existence unreasonable," regardless of the truth of the facts alleged in the application. *Malley*, 475 U.S. at 345.[10] Borelli's warrant application fails in both respects.

First, Borrelli's application is materially misleading. Borrelli stated that Tuggle made calls on January 3rd and 4th, when the undisputed evidence demonstrated that the calls were made the same day.[11] (Borrelli Dep., Ex. 11). Borrelli's application also misled the magistrate as to Antoine's conversation with Tuggle, by stating that "Mr. Tuggle did call the Sheriff 'low down scum.'" (*Compare*, Borrelli Dep., Ex. 11 & Antoine Dep., p. 28; Borrelli Dep., Ex. 9). Borrelli's errors caused the Magistrate to issue two warrants and conclude that Tuggle called Victor Hill "low

---

[10]     The Supreme Court's decision in *Malley* actually turned on this second inquiry, thereby confirming that veracity in the warrant application alone does not control the underlying question of liability.

[11]     The date of offense was included in the arrest warrant and is thus a material averment. As it was wrongly recorded in the second arrest warrant, the warrant is per se invalid. *Salley v. State*, 199 Ga. App. 358, 362(4), 405 S.E.2d 260 (1991).

down scum."[12] A reasonable jury could conclude that these errors were "materially misleading." *See e.g. Kelley v. Curtis*, 21 F.3d 1544, 1554-55 (11th Cir. 1994).

Even in the absence of Borrelli's materially misleading statements, a reasonably well-trained law enforcement officer in either Victor Hill or Borrelli's position, would not apply for an arrest warrant for Harassing Phone Calls based on Tuggle's two messages. O.C.G.A. § 16-11-391.1, in pertinent part, reads:

> A person commits the offense of harassing phone calls if such person telephones another person **repeatedly** . . . **for the purpose of annoying, harassing, or molesting another person**. . . ; [or] **uses** over the telephone **language threatening bodily harm**.

The undisputed facts known to Victor Hill and Borrelli were that Tuggle: (1) only called twice; (2) left his name and his phone number; (3) had not threatened bodily harm; and (4) had announced the purpose of his call both times: to schedule a meeting to discuss Hill's termination of twenty-seven former employees. (Borrelli Dep., p. 61; 97-98; Hill Dep. 214-215; Hanner Dep., p. 20). These facts do not establish probable cause.

Interpreting a closely related Georgia criminal statute, the Georgia Court of Appeals held that the words "you bastards," yelled by a citizen to an officer as he

---

[12] Borrelli cannot find shelter in the Magistrate's greater incompetence. *Malley,* 475 U.S. at 345.

drove by him, did not amount to language "so opprobrious or inherently abusive as amount to "fighting words" that would incite and immediate breach of the peace." *Turner v. State*, 274 Ga. App. 731, 732, 618 S.E.2d 607 ( 2005) (reversing conviction under O.C.G.A. § 16-11-39 – Disorderly Conduct).   The court focused on the circumstances and context of the offensive words, and distinguished a number of situations where citizens used abusive language while engaged in face-to-face confrontations with officers.  *See, e.g.*, *Anderson v. State*, 231 Ga. App. 807, 499 S.E.2d 717 (1998).

Just as in *Turner*, the circumstances and context of Tuggle's offensive utterances – two telephone messages requesting a meeting with a public official – would not cause an objectively reasonable officer to conclude that a crime had occurred.  Tuggle did not call "repeatedly" and the undisputed evidence established that his purpose was to set up a meeting with Victor Hill.  Borrelli grudgingly admitted the actual purpose of Tuggle's calls in her deposition:

> Q.   Now, tell me, what about your narrative is consistent with the law.
>
> A.   Well, the law says repeatedly telephone  somebody to annoy or harass them.  And there is obviously two phone calls documented here; and one is calling him a short little bastard, and the other one is saying low down scum, basically.  You know, whether you

say it's harassing or annoying, there is no other purpose for those phone calls than -- they weren't to voice his opinion. They were to specifically name call, and there was more than one phone call. So according to the law, in my opinion, of that day and -- it was consistent with that violation.

Q.    He asked for a meeting, too, right? Both times he said it?

A.    I would have to have Antoine's report, I mean, his statement for that, but in this one he said he wanted a meeting with "the short little bastard sheriff", yes.

Q:    Let me show you what's been marked as Plaintiff's Exhibit Number 9, . . . this is the statement of John Antoine?

A.    It appears to be.  [ . . . ]

Q.    So you would agree with me, would you not, that at least based on John Antoine's report when Mark Tuggle called and spoke to him directly, Mark Tuggle asked to speak to Sheriff Hill, correct?

A.    Yes.  [ . . .]

Q.    So according to John Antoine's report, the purpose of the call was to ask to speak to Sheriff Hill, correct?

A.    Yes. [. . .]

(Borrelli Dep, pp 97-99).

The Eleventh Circuit's decision in *Garmon v. Lumkin County*, 878 F.2d 1406 (11th Cir. 1989) eliminates any doubt as to whether Tuggle's Fourth Amendment claims survive summary judgment. In *Garmon*, the Court applied *Malley, supra*, in

affirming denial of summary judgment to a Georgia sheriff and his investigator. The sheriff decided that the plaintiff had falsely reported that she had been kidnaped because "we can't prove or disprove anything she said." *Garmon,* 878 F.2 at 1408. The Sheriff "instructed on of his investigators, who had little involvement in the case to obtain a warrant for [the plaintiff's] arrest." *Id.* The Eleventh Circuit held that "[f]rom the face of the arrest warrant it is evident that it was issued without probable cause." *Id., accord, Kelley v. Curtis*, 21 F.3d 1544, 1555-56 (11th Cir. 1994)("seeking an arrest warrant on the basis of such a conclusory affidavit . . . violated clearly established constitutional law"). A reasonable jury may well concluded that Victor Hill instructed Borelli to secure a warrant that could only be supported by an affidavit that, on its face, failed to establish probable cause. Tuggle thus alleges facts sufficient to go to a jury on his Fourth Amendment claims.[13]

---

[13]     As to Tuggle's malicious prosecution claim, Defendants only contend that they are also entitled to summary judgment because probable cause supported Borelli's application for an arrest warrant. Tuggle has fully briefed the probable cause issue and, accordingly, summary judgment be denied on his malicious prosecution claim as well. Should the Court elect *sua sponte* to consider whether Tuggle has properly alleged a "seizure" pursuant to "legal process," Tuggle respectfully requests that he be permitted to brief that matter to the Court. *See, e.g., Whiting v. Traylor*, 85 F.3d 581, 583-586 (11th Cir. 1996)(Arrest on warrant; overnight detention; release on bond; formal charge and arraignment sufficient to establish a "seizure" for Fourth Amendment purposes).

## B.    QUALIFIED IMMUNITY

Defendants contend that they are entitled to qualified immunity as to each of Tuggle's claims. Tuggle observes that Victor Hill has been sued in both his <u>official capacity</u> and <u>individually</u>. (*Complaint*, ¶¶ 5-10). As Tuggle has established facts sufficient to prove three separate constitutional violations, qualified immunity cannot shield Victor Hill, in his official capacity, from trial.[14] As critical as that distinction would be in many cases, it matters little in this one as the Defendants are not otherwise entitled to qualified immunity.

In this matter, there is simply no doubt that protecting the constitutional rights of ordinary citizens to express their strongly held beliefs to elected officials from an arbitrary abuse of authority that, by Sheriff Hill's own admission, was designed to stifle that expression outweighs any possible value in shielding these Defendants from a jury verdict. As the Eleventh Circuit explained just two years ago,

---

[14]    Victor Hill has not asserted Eleventh Amendment immunity as an affirmative defense at summary judgment. Tuggle thus believes Hill has subjected himself to the Court's jurisdiction and waived immunity. Alternatively, Tuggle has pled that Victor Hill, in his official capacity as a Georgia sheriff, is an independent county official for purposes of directing a subordinate to apply for an arrest warrant. <u>Complaint</u>, ¶¶ 5-10, *see e.g.*, *Manders v. Lee*, 338 F.3d 1304, 1328, n. 54, 1332 (Anderson, J. dissenting). As the Defendants have not briefed this issue, Tuggle does not address the matter further. However, should the Court elect *sua sponte* to address this issue, Tuggle requests the right to brief the matter further.

> The principles behind qualified immunity would be rendered meaningless if such immunity could be invoked to shelter officers who, because of their own interests, allegedly flout the law, abuse their authority, and deliberately imperil those they are employed to serve and protect.

*Kingsland v. City of Miami et al*, 382 F.3d 1220, 1234 (11th Cir. 2004). Victor Hill, "because of [his] own interests" in stamping out criticism of his vindictive termination of twenty-seven long serving deputy sheriffs, "abuse[d] [his] authority" by ordering his subordinates, including Borrelli, to "lock [Tuggle] up." The arrest "deliberately imperil[ed]" Tuggle, a citizen of Clayton County, whom he was "employed to serve and protect." *Id.* Qualified immunity provides no shield to such actors.

A public official asserting qualified immunity must initially prove that "he was acting within his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). It is undisputed that Hill and Borrelli were each acting pursuant to their discretionary authority. Tuggle must thus meet a sequential two prong test to overcome the qualified immunity defense. *See Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151 (2001). The "threshold inquiry" is whether the plaintiff's allegations, if true, state a constitutional violation. If the plaintiff succeeds, the court next considers whether that right was "clearly

established." *Id.; see also*, *Davis v. Williams*, — F.3d — , 2006 WL 1541458 (11th Cir., June 7, 2006).

Tuggle has established three separate constitutional claims arising from his unlawful arrest, detention and prosecution. *See, infra,* p. 12-23. Tuggle now turns to the second inquiry where the Defendants erroneously apply the same "narrow view" of "clearly established law" soundly rejected by the Supreme Court in *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508 (2002). *See, e.g., Holloman ex rel Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004)*. The Court must instead apply the more flexible approach since adopted by the Eleventh Circuit. *Id*. at 1278.

> While officials must have ***fair warning*** that their acts are unconstitutional, there need not be a case on all fours, with materially identical facts, before we will allow suits against them.

Id. at 1277) (emphasis added). Put another way, "officials can still be on notice that their conduct violates established law **even in novel factual circumstances**." *Hope*, 536 U.S. at 741 (emphasis added).

### 1.   TUGGLE'S FIRST AMENDMENT CLAIM

As to Tuggle's First Amendment claim, over fifty years of Supreme Court precedent plainly establish that law enforcement officers must be willing to tolerate

a certain amount of criticism from ordinary citizens if we are to remain a free society. *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895 (1949)("speech is often provocative and challenging . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest."); *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970 (1974)("invalidating ordinance resulting in conviction of person who "yelled obscenities and threats to an officer" because it "punished only spoken words and was not limited in scope to fighting words.") In *Lewis*, Justice Powell observed that the "fighting words" exception might require a narrower application in cases involving words addressed to a police officer, because

> a properly trained officer may reasonably be expected to exercise a
> higher degree of restraint than the average citizen and thus be less likely
> to respond belligerently to fighting words.

*Lewis*, 415 U.S. at 135.

When a law enforcement officer retaliates against a citizen who exercises his First Amendment right to criticize the officer's conduct, the plain language of the First Amendment, and the general principles set forth in these Supreme Court precedents give "fair warning" that a civil action for damages may soon follow. As

the Eleventh Circuit held in affirming this Court's denial of qualified immunity to

another Georgia sheriff in *Bennett v. Hendrix, supra,*

> [b]ecause this court has held since at least 1988 that it is "settled law"
> that the government may not retaliate against citizens for the exercise of
> First Amendment rights, we hold that the defendants were on notice and
> had fair warning that retaliating against the plaintiffs for their support
> of the 1998 referendum would violate the plaintiff's constitutional rights
> and if the plaintiffs' allegations are true, would lead to liability under §
> 1983.

The Defendants had fair warning that arresting, detaining and prosecuting Tuggle for

leaving his two messages violated the First Amendment.

## 2. TUGGLE'S FOURTH AMENDMENT CLAIMS

With regard to Tuggle's Fourth Amendment claims, the Eleventh Circuit has

consistently denied qualified immunity where the evidence establishes a

constitutional violation. The broad principle that "an arrest without probable cause

violates the Fourth Amendment" suffices in most instances as "fair warning" of the

specific constitutional violation. *See, e.g., Von Stein v. Bresher*, 904 F.2d 572, 578

(11th Cir. 1990); *Vinyard, supra; Thornton v. City of Macon et al.*, 132 F3.d at l399;

*Sheth v. Webster*, 145 F.3d at 1238; *Kingsland*, 382 F.3d at 1229; *Davis, supra*.

Furthermore, the Supreme Court's decision in *Malley v. Briggs*, supra, clearly

established the law applicable to this case twenty years ago. Borrelli's affidavit was

materially misleading and, even if the "facts" had been accurate, they could not have established probable cause.  Just as in *Malley*, qualified immunity must be denied.

## IV.   CONCLUSION

For the within and foregoing reasons, the Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment and calendar this matter for trial this Fall.

/s/ William J. Atkins
WILLIAM J. ATKINS
State Bar No.  027060
*Counsel for Plaintiff*

**PARKS, CHESIN & WALBERT, P.C.**
75 Fourteenth Street, N.E., Suite 2600
Atlanta, Georgia 30309
Telephone:  (404) 873-8000
Facsimile:  (404) 873-8050

## CERTIFICATE OF SERVICE

The undersigned certifies that on this date the foregoing **Plaintiff's Response to Defendants' Statement of Material Facts as to Which There is No Genuine Issue to be Tried** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

James Dearing, Esq.
Lynn Wood, Esq.

This 2nd day of February, 2007.

s/ *William J. Atkins*
William J. Atkins
State Bar No. 027060
*Counsel for Plaintiff*
ELEANOR MIXON ATTWOOD
State Bar No. 514014
*Counsel for Plaintiff*

**PARKS, CHESIN & WALBERT, P.C.**
75 Fourteenth Street, 26th Floor
Atlanta, Georgia 30309
Telephone: (404) 873-8000
Facsimile: (404) 873-8050
E-Mail: batkins@pcwlawfirm.com
        eattwood@pcwlawfirm.com