FILED IN CHAMBERS
U.S.D.C. Atlanta

JUL 16 2007

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGE MARK TUGGLE

        Plaintiff

v.

CLAYTON COUNTY SHERIFF VICTOR
HILL, in both his Official and
Individual Capacities, and
DEPUTY SHERIFF JOANNE
BORRELLI,

        Defendants

CIVIL ACTION NO.
1:06-CV-00272-ODE

## ORDER

In this civil action, Plaintiff George Mark Tuggle, alleges violations of his First and Fourth Amendment rights based on his alleged false arrest, malicious prosecution, and retaliatory prosecution as carried out by Clayton County Sheriff Victor Hill and Deputy Sheriff Joanne Borrelli. The case is before the Court on Defendants Clayton County Sheriff Victor Hill, In Both His Official and Individual Capacities, and Deputy Sheriff Joanne Borrelli's Motion for Summary Judgment [Doc. 36]. For the following reasons, Defendants' Motion for Summary Judgment is DENIED.

I.   Factual Background

Unless otherwise noted, the following facts are undisputed.

Victor Hill was elected Sheriff of Clayton County in July 2004. He took office on January 1, 2005, replacing Stanley Tuggle, Plaintiff's brother. On Monday January 3, 2005, Sheriff Hill fired twenty-seven employees of the Clayton County Sheriff's Office. Sheriff Hill claims that at the time he took office he

was aware that another Atlanta area sheriff had been murdered shortly before taking office.

Mark Tuggle learned of the terminations while watching the local news. At approximately 6:17 P.M. on January 3, 2005, Tuggle called the Clayton County Sheriff's Office. No one answered the phone, and Tuggle left the following voicemail message, "Sherry, this is Mark Tuggle. How 'bout calling me first chance you get. I'd like to get an appointment with that little, short lil' bastard sheriff of y'all's." At approximately 6:20 P.M. on January 3, 2005, Tuggle called the Sheriff's Office again. Captain Jon Antoine, Sheriff Hill's head of internal affairs answered the phone. Tuggle asked to speak with Sheriff Hill, but Antoine informed Tuggle that the Sheriff was in a meeting. Tuggle left his phone number and said that he wanted to speak with Sheriff Hill regarding the firing of the twenty-seven employees. During the conversation, Tuggle either referred to Sheriff Hill as "scum" or referred to people who worked for Sheriff Hill as "scum." Antoine filled out a message slip for Sheriff Hill indicating that Tuggle had called "re: termination of employees."

The following morning, Tuesday, January 4, 2005, Sheriff Hill's secretary Patricia Ruth listened to Tuggle's voicemail message from the previous evening. Upon hearing the word "bastard", Ruth handed the phone to Captain Antoine, who listened to the message in its entirety. At some point in the morning, at least one other employee of the Sheriff's Office, Lieutenant Phillip Hanner, heard the message. Sheriff Hill and his Chief Deputy, William Cassells, either heard the voicemail message or

2

were advised of its contents. Sheriff Hill reportedly said "I want him locked up."

Hanner made an audiotape copy of Tuggle's message, which he played for Deputy Sheriff Joanne Borrelli. Hanner asked Borrelli to prepare an incident report and fill out the application for a warrant for Hill's arrest. Borrelli prepared the report based on the audiotape of Hill's voicemail and a report Antoine prepared regarding his conversation with Hill. Borrelli did not speak with Sheriff Hill regarding either phone call, and did not get statements from any of the parties who heard the voicemail.

Borrelli and Hanner went to the Chief Magistrate Judge's office. Hanner did not enter the judge's private office, but Borrelli presented the application for the warrant and explained the facts of the case to the judge. Borrelli also played the judge an audiotape copy of Hill's voicemail. The judge issued two warrants for alleged violations of O.C.G.A. § 16-11-39.1, Harassing Phone Calls. Violation of the statute occurs when an individual "telephones another person repeatedly, whether or not conversation ensues, for the purpose of annoying, harassing, or molesting another person . . . ." O.C.G.A. § 16-11-39.1

Sheriff's deputies either appeared at Tuggle's home or called his home to advise Tuggle that a warrant had been issued for his arrest. Tuggle was at work, and spoke with the deputies by telephone. He asked if he could turn himself in later that day, but was informed that Deputy Chief Cassels wanted Tuggle to turn himself in within the hour or deputies would be dispatched to his workplace. Tuggle turned himself in at the Clayton County Jail, where he was met by Chief Cassells, Deputy Borrelli and Deputy

3

Southerland and placed in handcuffs. Borrelli turned Tuggle over to the corrections officers at intake, and Chief Cassells stated that Tuggle was to be placed in general population.

Upon his arrival at the jail, Tuggle was given an orange jumpsuit. In the Clayton County Jail, orange jumpsuits are typically worn by the general population, red jumpsuits are worn by violent offenders, and yellow jumpsuits are worn by misdemeanor inmates. Tuggle's blood pressure was taken during a medical screening at his booking. The nurse in charge at Clayton County Jail, Pauline Thomas, was called because Tuggle's blood pressure was dangerously high. Tuggle was given medication for his blood pressure, rechecked an hour later, and subsequently booked by being fingerprinted and photographed. The booking photograph of Tuggle in an orange jumpsuit was released to the media, and Tuggle was ordered to change into a yellow jumpsuit after being photographed. After being booked, Tuggle was admitted into the infirmary at the jail where he continued to receive treatment for his high blood pressure.

On January 5, 2005, twenty-nine hours after his arrest, Tuggle was released on bond. Tuggle's case was forwarded to the Solicitor's Office, and on August 5, 2005 the charges were dismissed. The dismissal was based on the fact that the statute requires "repeated" calls, which the Solicitor defined as "more than two but not many."

II. Standard for Summary Judgment

The Court will grant summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). An issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the non-moving party's case. Id. at 248.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). When the non-moving party bears the burden of proof at trial, the moving party's initial burden is to negate an essential element of the non-moving party's case or to show that there is no evidence to prove a fact necessary to the non-moving party's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991). When the moving party bears the burden of proof at trial, it "must demonstrate that 'on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'" Irby v. Bittick, 44 F.3d 949, 953 (11th Cir. 1995) (quoting United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991)).

Only after the moving party meets this initial burden does any obligation on the part of the non-moving party arise. Celotex Corp., 477 U.S. at 323; Chanel, Inc. v. Italian Activewear of Florida, 931 F.2d 1472, 1477 (11th Cir. 1991). At that time, the

non-moving party must present "significant, probative evidence demonstrating the existence of a triable issue of fact." Id.  If the non-moving party fails to do so, the moving party is entitled to summary judgment.   Four Parcels of Real Prop., 941 F.2d at 1438.

All evidence and justifiable factual inferences should be viewed in the light most favorable to the non-moving party. Rollins v. TechSouth, Inc., 833 F.2d 1525, 1532 (11th Cir. 1987); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Four Parcels of Real Prop., 941 F.2d at 1438 (quoting Anderson, 477 U.S. at 248). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 248.

III. Defendants' Motion for Summary Judgment

Defendants argue that they are entitled to summary judgment because: (1) there is no basis for Fourteenth Amendment liability; (2) Defendants are entitled to qualified immunity; and (3) there is no basis for Fourth Amendment liability because Defendants acted properly in pursuing Plaintiff's arrest.   In response, Tuggle argues that summary judgment is inappropriate because: (1) Defendants have moved for summary judgment on nonexistent claims; (2) a jury could find that Tuggle was arrested and detained in violation of his First Amendment rights; (3) a jury could find

that Tuggle was arrested without probable cause; and (4) Defendants are not entitled to qualified immunity.

A.    Fourteenth Amendment Liability

Defendants argue that they are entitled to summary judgment on any Fourteenth Amendment claims asserted by Tuggle, because none of their alleged conduct "shocks the conscience." McKinney v. Pate, 20 F.3d 1550, 1556 n.7 (11th Cir. 1994). However, as Tuggle points out, he has not asserted any independent violations of his Fourteenth Amendment rights. The complaint sets out three specific alleged violations of Tuggle's civil rights: (1) false arrest in violation of the Fourth Amendment [Complaint, ¶¶ 46-53]; (2) malicious prosecution in violation of the Fourth Amendment [Id. at ¶¶ 54-65]; and (3) retaliatory prosecution in violation of the First Amendment [Id. at ¶¶ 66-73].

The only reference to the Fourteenth Amendment found in the complaint occurs because Tuggle "asserts his federal claims pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourteenth Amendment to the United States Constitution." Id. at ¶ 1. The Fourteenth Amendment is the constitutional provision that makes the First and Fourth Amendments applicable to state and local governments, and is therefore incorporated into the alleged violations of Tuggle's rights under those amendments. See Chesser v. Sparks, 248 F.3d 1117, 1121 n.5 (11th Cir. 2001). And 42 U.S.C. § 1983 is the statutory provision that provides individuals with a cause of action against state and local governments for violations of fundamental rights, such as those protected by the First and Fourth Amendments. Furthermore, the "shocks the conscience" standard that Defendants cite has "no place in a civil

7

case for money damages," such as the instant action. <u>McKinney</u>, 20 F.3d at 1556 n.7.

As Tuggle has not asserted any independent claims under the Fourteenth Amendment, Defendants are not entitled to summary judgment on an asserted lack of liability for such claims.

B.   <u>Qualified Immunity</u>

Defendants have also raised the defense of qualified immunity as to all three of Tuggle's claims.  Qualified immunity provides "complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Thomas v. Roberts</u>, 261 F.3d 1160, 1170 (11th Cir. 2001)(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  To receive qualified immunity, a public official must first show that he was acting "within the scope of his discretionary authority when the allegedly wrongful acts occurred." <u>Courson v. McMillian</u>, 939 F.2d 1479, 1487 (11th Cir. 1991)(quoting <u>Rich v. Dollar</u>, 841 F.2d 1558, 1563 (11th   Cir. 1988)).  As making an arrest is part of the discretionary authority of a police officer, it is clear and undisputed that Defendants were acting within the scope of their discretionary authority when they arrested Tuggle. <u>See</u> <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002)(finding that "there can be no doubt" that an officer was within his discretionary authority when making an arrest).

Defendants having shown that they were acting within their discretionary authority, the burden now shifts to Tuggle to show that qualified immunity is not appropriate under a two-part test.

Lee, 284 F.3d at 1194. "As a threshold question, a court must ask, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. (quoting Saucier v. Katz, 533 U.S. 194 (2001)). This analysis is done using Plaintiff's version of the facts. Id. The second part of the test requires Plaintiff to show that the constitutional right was clearly established at the time of the violation. Id.

In determining whether a right is clearly established, "the salient question . . . is whether the state of the law [at the time of the events in question] gave [Defendant]s fair warning that their alleged treatment of [the plaintiff] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002). The Court of Appeals for the Eleventh Circuit has abrogated its prior holding that a right is only clearly established when there is "a case 'on all fours,' with materially identical facts." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004). Instead, courts must now "assess whether the facts of the instant case fall within statements of general principle from our precedents." Id. at 1278.

In this case, Tuggle has alleged that his constitutional rights were violated by Defendants' conduct in three ways: (1) falsely arresting him on the basis of a falsified application for an arrest warrant; (2) maliciously prosecuting him on the basis of the same falsified application for an arrest warrant; and (3) engaging in retaliatory prosecution on the basis of Tuggle's complaints about a public official.

9

### 1. Fourth Amendment Liability

Defendants argue that they are entitled to summary judgment on both of Tuggle's Fourth Amendment claims because Sheriff Hill and Deputy Borrelli had probable cause to arrest Tuggle. Although Defendants assert this as a separate grounds for granting summary judgment, it is more properly considered as part of the qualified immunity analysis. In response, Tuggle asserts that the warrant application discloses a lack of probable cause, and a reasonable officer in either Hill or Borrelli's position would not have applied for a warrant based on Tuggle's phone calls.

### a. False Arrest

Under the Fourth Amendment, individuals are protected from "unreasonable searches and seizures." An arrest is a seizure for Fourth Amendment purposes, and the reasonableness of an arrest is "determined by the presence or absence of probable cause for the arrest." Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007). The Eleventh Circuit has held that "[p]robable cause for an arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect has committed or was committing a crime." United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002).

Even when a law enforcement officer arrests an individual without probable cause, qualified immunity may still protect the officer. "All that is required for qualified immunity to be applicable to an arresting officer" is arguable probable cause. Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001). The Eleventh Circuit has explained that arguable probable cause exists

when "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest." Lee, 284 F.3d at 1195. Whether a law enforcement officer has either probable cause or arguable probable cause is determined by the elements of the alleged crime and the specific facts of the case. Skop, 485 F.3d at 1137-38.

In analyzing a claim of false arrest on the basis of a warrant application, as in the present case, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." Malley v. Briggs, 475 U.S. 335, 344-45 (1986) (internal citations omitted). Malley established that the proper question to answer in such a case is "whether a reasonably well-trained officer in [Defendants'] position would have known that he should not have applied for a warrant." Id. at 345. The Eleventh Circuit has denied qualified immunity in cases "of perjurious or recklessly false statements or omissions made by a police officer in support of a warrant . . . ." Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir. 1994).

The statute under which Tuggle was arrested states, in relevant part, that:

> A person commits the offense of harassing phone calls if such person telephones another person repeatedly, whether or not conversation ensues, for the purpose of annoying, harassing, or molesting another person or the family of such other person[.]

O.C.G.A. § 16-11-39.1. The Application for Criminal Arrest Warrant ("Application") presented to the Magistrate by Deputy Borrelli states the complaint as follows:

11

> On 010305 and 010405 George Mark Tuggle made phone calls to
> the Sheriff of Clayton County, Victor Hill with the purpose
> of annoying, harassing or molesting Sheriff Hill. On 010305
> Mr. Tuggle did call the Sheriff low down scum and on 010405
> he called the Sheriff, Victor Hill "short little bastard" as
> recorded on his secretaries [sic] voice mail.

[Def. Mot. for Summary Judgment, Ex. D]. Defendants provide the

following summary of their argument for a finding of probable

cause for Tuggle's arrest:

> In this case, Plaintiff admits to making back-to-back phone
> calls using derogatory and profane language. (Tuggle Depo.
> pp. 38-39). The tone of Plaintiff's message, when considered
> by those officers present, together with the circumstances on
> January 4, 2005, was a cause for concern. (Hanner Depo. p.
> 18). In light of the situation, Deputy Borrelli gathered all
> information available relating to Plaintiff's calls to the
> Sheriff's Office. She then completed the appropriate
> paperwork and presented it, along with the audiotape, to the
> Chief Magistrate. Sheriff Hill's involvement was that he
> ordered his staff to follow proper procedure if it was
> decided that Plaintiff had broken the law. (Hanner Depo. p.
> 27). Borrelli heard the audiotape and concluded that
> presenting all the facts to the Chief Magistrate was
> appropriate. Keep in mind, also, that according to Phillip
> Hanner, Plaintiff's voice "sounded shaky, angry and extremely
> upset." (Hanner Depo. p. 18).

[Def. Mot. for Summary Judgment, at 27]. However, viewing the

facts in the light most favorable to Tuggle, Defendants' have not

presented an accurate account of the events that lead to Tuggle's

arrest.

As an initial matter, the Court notes that the Application

misreports the dates of the phone calls made by Tuggle. The

evidence clearly establishes that both phone calls were made on

January 3, 2005, the first at 6:17 P.M. and the second at 6:20

P.M. When Tuggle first called, at 6:17 P.M., the phone was not

answered, and he left a message that has been copied to audiotape.

[Pl. Resp. to Mot. for Summary Judgment, Ex C, Tape of Tuggle's

Message]. The message was not heard until the following morning,

when Patricia Ruth checked the voicemail. [Ruth Dep., at 13-15]. Phillip Hanner provided a statement that he overheard Tuggle's message on January 4, 2005. [Borrelli Dep., Ex. 10].

In fact, the chronology that Borrelli included in her incident report is impossible. That report states that "[o]n 01042005 at 1815 hours a message was left on Sheriff Hill's secretaries voice mail, via the county telephone." [Borrelli Dep., Ex. 8]. However, the Arrest Report of Tuggle indicates that he was arrested at 3:30 P.M. on January 4, 2005, making a phone call at 6:15 P.M. on January 4, 2005 impossible. [Borrelli Dep., Ex. 7]. Approximately three minutes after the first call, at 6:20 P.M. on January 3, 2005, Tuggle called again, and Captain Jon Antoine answered the phone. [See Pl. Resp. to Mot. for Summary Judgment, Ex. D, Phone Message; and Def. Mot. for Summary Judgment, Ex. C, Antoine Statement]. It is clear that Borrelli incorrectly reported the chronology of phone calls in her Application.

The chronology of the phone calls is material to the issue of probable cause for Tuggle's arrest. The facts indicate that Tuggle called at 6:17 P.M. and left a voicemail in which he asked that someone named "Sherry" call him back because he wanted a meeting with Sheriff Hill. Three minutes later he called again, and spoke with Jon Antoine to express his displeasure with the termination of numerous employees from the Sheriff's Office earlier that day. Tuggle did not call the Sheriff's Office again. It is true that Tuggle referred to Sheriff Hill as a "short lil' bastard sheriff" in the message, and told Antoine that either Hill

13

was scum for firing the twenty-seven employees or that anyone who worked for Hill was scum.

Borrelli's investigation consisted solely of listening to the audiotape of Tuggle's message and reading Antoine's statement. Although she stated in her Application that the purpose of Tuggle's phone calls was to "annoy[], harass[], or molest[] Sheriff Hill," she admitted in her deposition testimony that according to Antoine's statement regarding Tuggle's phone call, "he says he is requesting a meeting" with Sheriff Hill. [Borrelli Dep., p.99-100]. Likewise, in his voicemail, Tuggle explicitly states that he wanted to arrange a meeting with Sheriff Hill. Two calls in a period of three minutes, with no subsequent phone calls, and an explicit request for a meeting cannot reasonably be said to provide probable cause for an arrest under the Harassing Phone Calls statute.

Furthermore, having listened to the recording of Tuggle's message, the Court does not agree with Defendants' characterization of Tuggle's voice as shaky, angry, or extremely upset. Tuggle used questionable language when he called the Sheriff's Office, but viewing the facts in the light most favorable to Tuggle, he was attempting to engage in a conversation with an elected public official about that official's actions. In fact, Tuggle testified at his deposition that he called the second time because he had not heard back from Sheriff Hill:

> Q: But you initiated the second call without verifying that the sheriff didn't call you the first time?
>
> ***
>
> A: Well, I didn't get a call back, or I wouldn't have called him the second time.

14

[Tuggle Depo., at 43-44].

Tuggle did not call repeatedly, and he was not attempting to harass, annoy or molest Sheriff Hill.[1]

As to Sheriff Hill's contention that he "ordered his staff to follow proper procedure if it was decided that Plaintiff had broken the law," the Court finds little support in the record. Phillip Hanner testified in his deposition that "after they played the message for the sheriff and for everybody who was in the suite, I recall the sheriff just matter of factly saying, I want him locked up." [Hanner Depo., at 20]. Borrelli confirmed that, "Phillip Hanner told me that the sheriff wanted him locked up." At the time Sheriff Hill made this statement, there is no evidence that Antoine had told him about the first phone call from Tuggle. [Antoine Depo., at 36]. Hill himself testified that he did not remember seeing the message Antoine wrote regarding Tuggle's first phone call. [Hill Depo., at 156].

Finally, Defendants cannot avoid liability by arguing that it was the Magistrate, not Deputy Borrelli or Sheriff Hill, who issued the warrants for Tuggle's arrest. The Eleventh Circuit has explicitly held that the issuance of a warrant by a Magistrate

---

[1]In their Reply Brief, Defendants assert that Tuggle adopted the facts that are contained in the Application during his deposition, and therefore he cannot dispute them now. However, the only aspect of the Application that Tuggle agreed was accurate was the description of what he said during his phone calls, not the times at which he called. [Tuggle Depo., at 44-45]. In fact, Tuggle explicitly stated during his deposition that the Application was incorrect in reporting the dates on which he called. [Id. at 42-43]. Furthermore, the tape of Tuggle's message had not been located at the time Tuggle's deposition was taken.

"does not absolve the officer who applied for the warrant from liability," if the officer has used false statements to establish probable cause. Garmon v. Lumpkin County, 878 F.2d 1406, 1408-09 (11th Cir. 1989). Viewing the facts in the light most favorable to Tuggle, Defendants did not have probable cause for Tuggle's arrest and thus violated the Fourth Amendment.

Having found that Defendants violated Tuggle's constitutional rights, the Court must determine whether the right was clearly established. The Eleventh Circuit's binding precedent clearly established, at the time of Tuggle's arrest, that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures. See Skop, 485 F.3d at 1143. Viewing the facts in the light most favorable to Tuggle, Defendants did not possess arguable probable cause to arrest him and violated clearly established law when they arrested him. Accordingly, Defendants are not entitled to summary judgment on Tuggle's Fourth Amendment false arrest claim.

b.    Malicious Prosecution

Tuggle has also asserted a claim for malicious prosecution in violation of his Fourth Amendment rights. The Eleventh Circuit has held that a federal malicious prosecution claim is established when an individual "prove[s] a violation of his Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution." Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003). Defendants' argue that they are entitled to summary judgment on Tuggle's malicious prosecution claim because they had probable cause to arrest him, and therefore did not violate the Fourth Amendment right to be

16

free from unreasonable seizures. As the Court has already found that Defendants' actions, viewed in the light most favorable to Tuggle, constituted a violation of clearly established Fourth Amendment law, Defendants are not entitled to summary judgment on the malicious prosecution claim.

### 2. First Amendment Liability

Tuggle claims that Sheriff Hill ordered his arrest in order to prevent Tuggle from calling his office again, in violation of the First Amendment. On summary judgment, Defendants' sole argument is that they are entitled to qualified immunity because a police officer effectuating a lawful arrest cannot be subject to liability under the First Amendment. See Redd v. City of Enterprise, 140 F.3d 1378, 1383-84 (11th Cir. 1998). However, the Court has already found that Defendants did not effectuate a lawful arrest because they lacked arguable probable cause.

To prove retaliatory prosecution in violation of his First Amendment rights, Tuggle must prove: (1) that his speech was protected; (2) that his arrest would likely deter a person of ordinary firmness from the exercise of First Amendment rights; and (3) that there is a causal connection between the retaliatory action and the adverse effect on speech. Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005). The first and third requirements are easily addressed, because the language of Tuggle's phone calls is clearly protected, City of Houston v. Hill, 482 U.S. 451, 462-63 (1987), and there has been no suggestion that Defendants would have arrested him absent his speech. Bennett, 423 F.3d at 1250.

17

The Court also finds, upon viewing the facts in the light most favorable to Tuggle, that Defendants' actions would likely deter a person of ordinary firmness from the exercise of First Amendment rights. The Eleventh Circuit adopted a standard articulated in the Court of Appeals for the Eleventh Circuit, that "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Id. at 1254 (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)). Although the police officers in Bennett instituted "a prolonged and organized campaign of harassment" against the plaintiffs, the court also cited numerous cases where an adverse effect was found for less harassing acts. See e.g., Garcia v. City of Trenton, 348 F.3d 726, 729 (3rd Cir. 2003) (the retaliatory issuance of parking tickets totaling $35 created a jury issue because the defendant "engaged the punitive machinery of government in order to punish Ms. Garcia for her speaking out"); Keenan v. Tejada, 290 F.3d 252, 259 (5th Cir. 2002) (one plaintiff stated a retaliation claim that would chill a person of ordinary firmness with allegations that officers stopped his car and detained him for an unreasonable time, "allegedly with their guns drawn during part of the traffic stop, and ultimately issued only a minor traffic citation that was later dismissed"); Bloch v. Ribar, 156 F.3d 673, 680-81 (6th Cir.1998) (in response to plaintiff's criticism, sheriff publicly released confidential and humiliating details of plaintiff's rape; such act was sufficiently adverse to chill a person of ordinary firmness); Bart, 677 F.2d at 624-25 ("campaign of petty harassments" against the plaintiff

including "[h]olding her up to ridicule for bringing a birthday cake to the office" stated a cause of action for retaliation).

Defendants' acts in arresting Tuggle were sufficiently adverse that a jury could find that they would chill a person of ordinary firmness from exercising his First Amendment rights. Furthermore, the Eleventh Circuit's binding precedent clearly established, at the time of Tuggle's arrest, that "direct retaliation by the state for having exercised First Amendment freedoms in the past is particularly proscribed by the First Amendment." Cate v. Oldham, 707 F.2d 1176, 1189 (11th Cir. 1983).[2] Viewing the facts in the light most favorable to Tuggle, Defendants arrested him on the basis of constitutionally protected speech and his arrest would likely deter a person of ordinary firmness from the exercise of First Amendment rights. Accordingly, Defendants are not entitled to summary judgment on Tuggle's First Amendment false arrest claim.

IV. Conclusion

For the foregoing reasons, Defendants Clayton County Sheriff Victor Hill, In Both His Official and Individual Capacities, and

---

[2]Although the decision in Bennett was made after the actions complained of in the instant action, the only impact of that decision is on the proper analysis of a retaliation claim. Cate makes clear that Defendants' had fair warning that the type of direct retaliation they engaged in against Tuggle violated his First Amendment rights.

Deputy Sheriff Joanne Borrelli's Motion for Summary Judgment [Doc. 36] is DENIED.

SO ORDERED, this __13__ day of July, 2007.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE